**H. PHILLIPS CO., INC., a Wisconsin Corporation, Plaintiff,**

v.

**BROWN–FORMAN DISTILLERS CORPORATION, a Delaware Corporation, Defendant.**

No. 79–C–543.

United States District Court, W. D. Wisconsin.

Feb. 6, 1980.

2. At no time during her testimony did Mrs. Gonzalez describe the plaintiff's behavior as *normal.* (tr. 104–115).

Jack R. DeWitt, of DeWitt, McAndrews & Sundby, S. C., Madison, Wis., for plaintiff.

Donald L. Heaney, of Isaksen, Lathrop, Esch, Hart & Clark, Madison, Wis., for defendant.

JAMES E. DOYLE, Chief Judge.

Plaintiff has served and filed a renewed motion for a preliminary injunction, to which this opinion and order are directed. For the purpose of deciding the said motion, and for no other purpose, I find as fact those matters set forth hereinafter under the heading "Facts."

*Facts*

As of no later than about 1947, Wisconsin Liquor Company of Green Bay and Oshkosh, a Wisconsin corporation engaged in the wholesale distribution of liquor, distributed an alcoholic beverage called "Southern Comfort" in the Oshkosh, Wisconsin, area, and it continued to do so until about 1972, when its name was changed to Ed. Phillips & Sons Co. of Oshkosh (Ed. Phillips). Southern Comfort is classified in the trade as a cordial or specialty. Thereafter, Ed. Phillips continued to distribute Southern Comfort in the Oshkosh area until October 1, 1979, when Ed. Phillips merged with H. Phillips Co., also a Wisconsin corporation, with H. Phillips Co. as the surviving corporation. Thereafter, H. Phillips Co. continued to distribute Southern Comfort until about mid-October, 1979, when the events occurred which are the subject of this lawsuit. Over the years Wisconsin Liquor Company and then Ed. Phillips had purchased Southern Comfort from its manufacturer, the Southern Comfort Corporation, for distribution in the Oshkosh area. In about mid-1979, defendant Brown-Forman Distillers Corp. (Brown-Forman) acquired the Southern Comfort Corporation. Thereafter, until mid-October, Ed. Phillips and then H. Phillips Co. purchased Southern Comfort from Brown-Forman and continued such distribution. Prior to the merger, H. Phillips Co. had not sold Southern Comfort. Neither the Southern Comfort Corpo-ration nor Brown-Forman has sold any product other than Southern Comfort to Wisconsin Liquor Company, Ed. Phillips, or H. Phillips Co. Excluding H. Phillips, Brown-Forman had three wholesale dealers in Southern Comfort in the Oshkosh area as of mid-October 1979.

(Wisconsin Liquor Company, Ed. Phillips, and H. Phillips Co. will be referred to hereinafter, collectively, as H. Phillips Co., unless there is reason to refer to them more precisely. Southern Comfort Corporation and Brown-Forman will be referred to, collectively, as Brown-Forman, unless there is reason to refer to them more precisely.)

There has never been any written agreement between Brown-Forman and its predecessor, on the one hand, and H. Phillips Co. and its predecessors, on the other. At all times since about 1947, H. Phillips Co. has been permitted by Brown-Forman: to sell Southern Comfort at wholesale in the Oshkosh area in containers bearing the Southern Comfort tradename, trademark, logotype and commercial symbol; and to use the Southern Comfort tradename, trademark, logotype, commercial symbol, and advertising in connection with such wholesale sales. Brown-Forman has forwarded to H. Phillips Co. promotional material bearing the Southern Comfort and Brown-Forman tradenames, and H. Phillips Co. has used these materials in promoting sales of Southern Comfort in the Oshkosh area.

In recent years, the gross receipts by H. Phillips Co. and Ed. Phillips from the wholesale sales of Southern Comfort have been about $250,000 to $300,000, and their net profit approximately $25,000. H. Phillips Co. and Ed. Phillips, in aggregate, sold at wholesale many varieties of liquors and several brands within particular varieties. For the year ending in May, 1979, the volume of Southern Comfort sold by Ed. Phillips represented between 2% and 3% of the aggregate volume of all liquor sold by the two companies.

A Wisconsin state manager for the B–F Spirits, Ltd., Division of Brown-Forman ad-

vised a representative of Ed. Phillips in September, 1979 that there was an allotment of Southern Comfort, gift wrapped for the holidays, available to it. At the time of this communication, the Brown-Forman representative was not aware of the impending merger of Ed. Phillips and H. Phillips Co. On about September 26, 1979, a letter describing the impending merger was mailed on behalf of Ed. Phillips and H. Phillips Co. to Brown-Forman. Shortly after October 1, 1979, H. Phillips Co. placed an order with Brown-Forman for the full allotment of gift-wrapped Southern Comfort plus sufficient non-gift-wrapped Southern Comfort to make a full truck load. Delivery has not been made.

On about October 14, 1979, a representative of Brown-Forman advised a representative of H. Phillips Co. that Brown-Forman was terminating the distributorship, effective immediately. In a letter dated October 16, 1979, and addressed to "Ed Phillips & Sons," a representative of Brown-Forman confirmed "that Ed Phillips & Sons is being terminated, effective immediately, as a distributor of Southern Comfort in the state of Wisconsin." Brown-Forman was requested to reconsider its decision, did so, and then, by letter dated October 31, 1979, reaffirmed "that your company was being terminated as a distributor of Southern Comfort." In the latter letter, the reason stated was that "Ed Phillips & Sons Company" had unilaterally closed its office and warehouse in Oshkosh and had begun to service the Oshkosh market from Wausau, Wisconsin, 97 miles distant.

Apparently because it is a specialty, as contrasted, for example, with scotch whiskey or bourbon whiskey or gin, purchasers frequently ask for Southern Comfort by name and they decline purported substitutes. This apparently explains why, from the viewpoint of a wholesaler, it is a business-starter. That is, the proprietor of a tavern or retail liquor outlet will sometimes order Southern Comfort and only Southern Comfort from a wholesaler who sells it, and will later expand his or her purchases from that wholesaler to include other beverages.

As a result of the action by Brown-Forman, H. Phillips Co. has been unable to fill a number of orders for Southern Comfort by its customers, and this inability to continue to supply Southern Comfort has been a business embarrassment to H. Phillips Co. and its salesmen.

Unless enjoined, Brown-Forman will continue to refuse to sell and deliver Southern Comfort to Ed. Phillips.

## OPINION

Assuming that the Wisconsin Fair Dealership Law (§§ 135.01 through 135.07, Wis. Stat.) applies to dealerships granted prior to April 5, 1974, its effective date, I consider it a rather close question, on the record thus far, whether H. Phillips Co. and its predecessors have been a "dealer" in Southern Comfort, within the meaning of the Wisconsin Fair Dealership Law.

I appreciate that the statute expressly directs that it be "liberally construed and applied to promote its underlying remedial purposes and policies" and that one such purpose and policy is "To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis . . . ." § 135.025. However, this direction by the legislature to the courts to construe and apply the statute liberally does not mean that the boundaries of its coverage should be construed expansively. That is to say, the legislature has acted to protect "dealers" from "grantors" rather zealously, particularly with respect to the continuation of "dealerships." If a relationship is a dealership, the protections afforded the dealer are to be construed and applied liberally to the dealer. But the statute itself undertakes to draw a line to encompass the kinds of enterprises and relationships which are to enjoy such protection. There is no basis upon which the courts can provide that protection to enterprises and relationships which fall without the legislative line.

Brown-Forman made frequent sales of Southern Comfort to H. Phillips Co. over the years, for resale by H. Phillips Co. to

retailers. In this sense, Brown-Forman "granted" H. Phillips Co. "the right to sell . . . goods. . . ." § 135.02(2). Also, Brown-Forman "granted" H. Phillips Co. "the right to . . . use a trade name, trademark, service mark, logotype [or] advertising . . . ." § 135.02(2). The question is whether the agreement implied by the two parties was an agreement in which there was "a community of interest in the business of offering, selling or distributing goods . . . at wholesale . . . ." § 135.02(2). Because "community of interest" is expressly defined by the statute, § 135.02(4), the more precise question is whether there was "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods . . . ." H. Phillips Co.'s continuing financial interest both in the operation of its own wholesale Southern Comfort business and in the marketing of Southern Comfort is clear. Did Brown-Forman have any such continuing financial interest?

From cases construing this statute and similar legislation, it seems that the presence or absence of a continuing interest on the part of the "grantor" is to be ascertained both by examining objective factors and by examining evidence of the "grantor's" state of mind.

Objectively, of course, every manufacturer stands to gain if a wholesaler continuously sells much of the product rather than little of it. But this phenomenon is too universal to be helpful. The same can be said of every manufacturer who extends credit to the wholesaler; the more the wholesaler sells and is paid for, the more likely the credit will be honored. The most persuasive objective factor would be whether a particular "dealer" is the only sales outlet for the manufacturer within a defined territory, or perhaps whether the number of dealers within a territory is so small that the manufacturer's fortunes would rise or fall in close synchronization with the effectiveness or ineffectiveness of a particular dealer. In the present case, H. Phillips Co. is not Brown-Forman's sole sales outlet for Southern Comfort any-

where. Nor does the record permit any finding whether four sales outlets in the "Oshkosh area" represent many or few strings to Brown-Forman's bow.

Whether a "grantor" entertains a continuing interest in the operation of a particular wholesaler's business or in that particular wholesaler's marketing performance is likely to be reflected in the number and nature of the demands imposed upon the wholesaler by the manufacturer. Is it part of the agreement, express or implied, that the wholesaler is required to purchase from the manufacturer or to sell to retailers certain minimum amounts of the product? Is it part of the agreement that the wholesaler is required to acquire and maintain a certain level of physical plant and sales force, to keep up a certain minimal inventory, to engage in a certain minimal level of advertising and other promotion? If no such mandates are laid upon the wholesaler, is there evidence that the manufacturer has engaged in active oversight, inquiry, and exhortation in such matters? Or is there evidence that the manufacturer has involved itself in insuring the success of the wholesaler's operations by engaging itself in extensive advertising in the sales area, or by furnishing the wholesaler with the means to engage in such sales promotion, or by providing supplementary services to the retailer-customers of the wholesaler?

Upon the record presently made in this case, only four points have been presented which may be relevant to this inquiry and helpful to plaintiff's contention.

1. Brown-Forman's letters of October 16, 1979, and October 31, 1979, used the language: "being terminated as a distributor . . ." and "was being terminated as a distributor." Plaintiff observes, correctly, that the word "distribute" appears in the statutory definition of "dealership." § 135.02(2). But it seems irrelevant whether Brown-Forman referred to H. Phillips Co. as a "distributor" or even a "dealer." The question is whether, in fact, the relationship met the statutory definition of "dealership."

2. There is testimony, which I have accepted in the factual findings above, that Brown-Forman has furnished H. Phillips Co. with "promotional material bearing the 'Southern Comfort' and B–F tradename." Such conduct on Brown-Forman's part is probative in some degree that it entertained a continuing financial interest in H. Phillips Co.'s marketing of Southern Comfort. But the evidence is undeveloped with respect to the frequency of this activity by Brown-Forman, and the quantity and nature of the promotional material.

3. The duration of dealings between the parties is impressive. Surely it gave rise to reasonable expectation on the part of H. Phillips Co. that it would continue to enjoy the opportunity to buy Southern Comfort from Brown-Forman and to resell it in the Oshkosh area, just as it gave rise to reasonable expectation on the part of Brown-Forman that H. Phillips Co. would use the opportunity and would continue to purchase the product.[1] The inference can be drawn readily that the experience with H. Phillips Co. had been satisfactory—that is, profitable—to Brown-Forman. It is difficult to isolate the bearing, if any, which these considerations may have upon the presence or absence of a "continuing financial interest" on the part of Brown-Forman in the operation of H. Phillips Co.'s business or in H. Phillips Co.'s marketing of Southern Comfort. Presumably on the occasion of the first, arm's length sale by a manufacturer to a wholesaler, a spark of hope flickers in the manufacturer's heart that the wholesaler will not go broke the next day and become unable to make further purchases. But this phenomenon is also too universal to be what the legislature must have meant by a "continuing financial interest" on the part of the manufacturer in the operation of the wholesaler's business or in the wholesaler's marketing performance. On the other hand, by the time of the 500th sale, for example, it is to be expected that the flicker of hope has become a rather constant, however modest, flame of hope, indeed expectation, that the wholesaler will make another 500 purchases in the years ahead. The manufacturer can be expected to have developed a continuing financial "interest" or desire that the wholesaler continue the operation of its business and that the wholesaler continue to market the manufacturer's product. If "interest," as used in § 135.02(4), includes this kind of interest, and it seems reasonable that it should, this plaintiff is likely ultimately to prevail in its contention that a dealership existed as of October, 1979, within the meaning of § 135.-02(2).

4. This view is fortified to a degree by the evidence of how Brown-Forman viewed the matter in October, 1979. I have deemed irrelevant its use of the word "distributor" in the October 16, 1979, and October 31, 1979, letters. But the use of the words "terminated" and "termination" is revealing. Brown-Forman believed that there was in existence a relationship capable of being continued or terminated, as contrasted with a simple series of discrete sales transactions. Moreover, Brown-Forman applied the adjective "unilateral" to H. Phillips Co.'s "action . . . in closing your office and warehouse in Oshkosh. . . . ." The implication is that Brown-Forman considered H. Phillips Co. to be obliged, as a condition of the agreement, at least to consult before taking such action. Perhaps most important, the implication is present that Brown-Forman believed that under the agreement, H. Phillips was required to meet certain minimal standards of performance with respect to the adequacy of its office and warehouse facilities.

When a dealership agreement is implied rather than expressed, particularly when the implication arises from a long period of dealing, the time at which the dealership

---

1. Both parties and the court agree that the time has not come in this lawsuit, if it is ever to come, for evidence to be presented on the justification for Brown-Forman's action or for the court to evaluate it. On the meager record thus far developed, it is difficult to perceive why Brown-Forman decided, if it did, that the fact of the merger alone required termination, without exploration of the practical effects of the merger upon sales of Southern Comfort in the Oshkosh area.

has been granted is difficult to pinpoint. In the present case, however, if a grant occurred, as I have concluded it probably did, it occurred prior to April 5, 1974, the effective date of the Wisconsin Fair Dealership Law.

Section 135.03 of the original statute prohibited cancellation or alteration, without good cause, of dealerships entered into after its effective date. The notice requirement embodied in § 135.04 contained no similar limitation. An amendment effective November 24, 1977, L.1977, c. 171, § 1, eliminated from § 135.03 the words "entered into after the effective date of this act (1973)."

At the same time, the legislature amended the statute by adding § 135.025, entitled "Purposes; rules of construction; variation of contract." Subsection (2)(c) of the new § 135.025 provided: "The underlying purposes and policies of this chapter are: . . (c) To provide dealers with rights and remedies in addition to those existing by contract or common law . . .." Subsection (2)(d) provided: "The underlying purposes and policies of this chapter are: . . (d) To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States." And subsection (3) provided: "The effect of this chapter may not be varied by contract or agreement. Any contract or agreement purporting to do so is void and unenforceable to that extent only."

Because the legislation as it stood in October, 1979, does not declare expressly whether it is or is not to be applied to dealerships granted prior to April 5, 1974, it is necessary to inquire into the legislative intention in this respect.

The major indication that by 1977 the legislature intended coverage of all dealerships whenever granted, of course, is its deletion from § 135.03 of the words "entered into after the effective date of this act (1973)." This view finds support in the declaration in the newly added § 135.-025(2)(c) that one of the purposes of the statute is "To provide dealers with rights and remedies in addition to those *existing*

by contract . . .." (emphasis added). The view finds support as well in that part of the statement of purpose in § 135.-025(2)(d) which I have underlined in the following quotation: "To govern *all* dealerships, including any renewals or amendments, *to the full extent consistent with the constitutions of this state and the United States."*

Finally, the view that the 1977 legislature intended coverage of all dealerships whenever granted finds some support in a sliver of evidence in the legislative history. The Legislative Reference Bureau drafting file for the 1977 amendments (1977 Assembly Bill 218, Chapter 171, Laws of 1977) contains a letter from William F. Nelson, a lawyer, attached to a letter by Representative Thomas A. Hauke, described as a sponsor of the 1977 amendments, to the chairman of the Senate Commerce Committee. Mr. Nelson's letter includes the following statement:

> The statute as amended to delete that language ["entered into after April 5, 1974"] would not require retroactive interpretation, as has often been contended, but would indeed rather only permit the trial court to determine what application could constitutionally be given to the law on a case-by-case basis. It would seem to me that this would maximize fairness to all concerned.

This information has been presented by Brown-Forman as revealing a narrower legislative intention. However, to the extent that Mr. Nelson's statement should be equated with the ultimate intention of the whole legislature, I suggest that it would amount to something like this: We legislators desire the statute to apply to all dealerships, whenever granted; we recognize that constitutional questions exist with respect to its application to dealerships granted prior to April 5, 1974; we abandon our independent responsibility to construe and to honor constitutional limits upon our power; we leave it to the courts to limit application if they decide it must be limited.

There are contrary indications as to legislative intent, indications that the legislature

intended the statute to apply only to dealerships granted on and after the effective date of the statute. First, in 1974, when the major decision was made to enact a fair dealership law, the legislature explicitly provided in § 135.03 that the cause requirement for cancellation or alteration was to be prospective only. Second, the failure then to include a comparable provision in § 135.04 suggests a drafting oversight. In 1977, this oversight might have been corrected by adding something to § 135.04, but an alternative was to eliminate the pertinent words from § 135.03 and then, in a new subsection (§ 135.025(2)(d)), to state the legislative purpose in this respect as to the entire regulatory scheme. Third, the appearance of the words "including any renewals or amendments" for the first time in § 135.025(2)(d) suggests that the omission of such words from the expressly prospective language of the original version of § 135.03 was now being corrected to make plain that even though a dealership had been granted prior to April 5, 1974, subsequent renewals or amendments would be within the statute's range of applicability. Fourth, and possibly most persuasive, is the first sentence of § 135.025(3): "The effect of this chapter may not be varied by agreement." This language has a distinctly prospective ring, that is, the sound of a warning. This implication is fortified by the use of the word "purporting" in the second sentence of the same subsection ("Any contract or agreement purporting to do so [that is, to vary the effect of the statute] is void and unenforceable to that extent only."). To purport is to intend, to have in mind, or perhaps to imply or express an intention or a state of mind. When no statute is in existence, one cannot purport to vary its effect by contract or agreement.

In the face of this uncertainty as to the actual legislative intent, it is consistent with traditional rules of construction to construe the statute so as to avoid the necessity to decide a serious constitutional issue. It is quite clear that a serious constitutional issue must be met and decided if the Wisconsin Fair Dealership Law is to be applied to dealerships granted prior to April 5, 1974.

There is no evidence whatever in the present record that an implied dealership agreement between H. Phillips Co. and Brown-Forman imposed upon either party the obligation to adhere to it indefinitely in the absence of good cause to terminate, or that the agreement required Brown-Forman to give notice of termination or alteration stating its reasons, or to give H. Phillips an interval within which to rectify the matter. Therefore, to apply the requirements of the Wisconsin Fair Dealership Law to this dealership would "impair the obligation of" the contract, and violate the literal terms of Article 1, Section 10, Clause 1 of the Constitution of the United States. We know that "the contract clause" is not to be construed literally and that judicial balancing must be engaged in, but we also know that the contract clause has not been dropped from the Constitution, as once it may have seemed. *E&E Hauling, Inc. v. Forest Preserve District,* 613 F.2d 675 (7th Cir. 1980), page 678. And we know, generally, that: "The severity of the impairment measures the height of the hurdle the state legislation must clear." *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978).

It can fairly be said that the Wisconsin Fair Dealership Law has a sharp bite. It curtails harshly the range of choice formerly enjoyed by grantors of dealerships. The degree of its impairment of the obligations of contracts must be described as severe. In deciding whether an impairment of such severity is a justifiable exercise of the police power, we must look to the purposes of the statute. Fortunately, in the 1977 amendment, the legislature made those purposes explicit. Section 135.025(2) declares that the purposes include the promotion of "the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis," and the protection of dealers "against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships."

Had the initial enactment of the Wisconsin Fair Dealership Law in 1974 included this express declaration of its purposes and had that initial enactment also expressly extended its coverage to all dealerships whenever granted, and had its application to a pre-existing dealership then been challenged in a lawsuit, it would have been necessary for the court to weigh this impairment of contract by the tests enunciated most recently in *Allied Structural Steel, supra,* including the five factors referred to in *Allied Structural Steel* as having been set forth in *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 444–447, 54 S.Ct. 231, 242–243, 78 L.Ed.2d 413 (1934). In this weighing process, the court would have noted that while the legislature had not declared that the need for the protection of dealers was an emergency, it had described the public interest at stake as "compelling." The court would have noted that in the judgment of the legislature, a societal interest was at stake, not simply the interest of a favored group, and perhaps that the legislature had adjudged this societal interest to be "basic." The court might have decided that the particular relief chosen by the legislature was appropriately tailored to respond to the compelling public interest, if not to an "emergency." The court might have decided that the conditions imposed upon past grantors were reasonable. The court could not have found that the legislation was limited to the duration of the existence of the compelling need or the emergency.

The historical fact, however, is that in 1974 the legislature did not include a declaration of the purposes of the statute. It seems reasonable to assume that the purposes it stated in 1977 correspond to the purposes entertained, but simply not expressed, by the legislature in 1974. If that assumption is valid, then, when it made the initial and critical decision to enact a Fair Dealership Law in 1974, the conscious legislative judgment was that those very purposes could be realized without the application of the Law's requirements to dealerships granted prior to the effective date of the statute.[2] Of course, the legislature may have altered its judgment in this respect between 1974 and 1977, as I assume for the moment it did. A hesitant and tardy legislative decision that severe impairment of the obligations of contract was a necessity would be somewhat less impressive than a firm and prompt decision that such necessity existed.

For the reasons stated, I conclude that there is a serious constitutional question whether the Wisconsin Fair Dealership Law may be applied to dealerships granted prior to April 5, 1974. I conclude that it is unclear whether, as of 1977, the legislature intended the statute to apply to dealerships granted prior to April 5, 1974. I conclude that plaintiff has not shown that it enjoys a sufficiently good chance to prevail in its contention that the statute should apply to the pre-existing H. Phillips Co. dealership in Southern Comfort.

Accordingly, it is ordered that plaintiff's motion for a preliminary injunction is denied.

---

**2.** This is accurate at least as to the cause requirement of § 135.03. It is probably accurate as to the notice requirement of § 135.04, as well. Although there is no need to decide the point presently, it seems probable that the coverage of § 135.04, as originally enacted, should have been held to be congruent with that of § 135.03, as originally enacted.