Glenn KANIA, d/b/a Glenn's Air Freight, Plaintiff-Appellant-Petitioner,

v.

AIRBORNE FREIGHT CORPORATION, Defendant-Respondent.

Supreme Court

*No. 79–1022. Argued November 25, 1980.—*
*Decided January 6, 1981.*

(Also reported in 300 N.W.2d 63.)

748

For the petitioner there were briefs by *Timothy J. Aiken, Mark A. Swartz* and *Samster, Aiken, Peckerman & Swartz, S. C.,* of Milwaukee, and oral argument by *Timothy J. Aiken.*

For the respondent there was a brief by *John R. Dawson, Michael A. Bowen* and *Foley & Lardner* of Milwaukee, and oral argument by *Michael A. Bowen.*

COFFEY, J.    This is a review of an appellate court decision affirming a summary judgment and orders entered in the Milwaukee County Circuit Court, the Hon. William A. Jennaro, presiding, against Glenn A. Kania, d/b/a Glenn's Air Freight (plaintiff-petitioner). The circuit court denied Kania's motion for a temporary injunction and dismissed his request for a permanent injunction, both asserting that Airborne sought to terminate an alleged dealership contract in violation of the Wisconsin Fair Dealership Law (WFDL), ch. 135, Stats.

The plaintiff in his request for a permanent injunction alleged that on March 19, 1979, the defendant gave a thirty-day written notice of termination of a written contract without reciting good cause in violation of sec. 135.03, Stats.,[1] and failing to comply with the 90-day notice requirement and 60-day deficiency rectification

---

[1] Sec. 135.03, Stats., provides:

"**Cancellation and alteration of dealerships.** No grantor, directly or through any officer, agent or employe may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement entered into after April 5, 1974 without good cause. The burden of proving good cause shall be on the grantor."

The last sentence of this section was amended by ch. 171, sec. 1 of the Laws of 1977, to provide, "The burden of proving good cause is on the grantor."

provision in sec. 135.04.[2] In its answer, the defendant admitted the execution of a written contract, but denied that the contract created a dealership arrangement and alleged that the notice of termination was in compliance with the contract. An evidentiary hearing was conducted in support of the plaintiff's temporary injunction motion with Michael Locke testifying as Milwaukee district manager for Airborne and Kania testifying on his own behalf with supporting affidavits that established the following:

I. Airborne is an air freight forwarder engaged in the business of rapid air transport of shipments between distant cities. In order to meet the competition of other air freight forwarders, Airborne arranged with Kania for the pick up and delivery of their customer's packages at the airport, their homes or businesses and transfer them to or from a nearby airport.

II. The plaintiff is engaged in the business of "over-the-road" transportation of freight in the metropolitan Milwaukee area.

[2] Sec. 135.04, Stats., provides:

"**Notice of termination or change in dealership.** Except as provided in this section, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency. If the deficiency is rectified within 60 days the notice shall be void. The notice provisions of this section shall not apply if the reason for termination, cancellation or nonrenewal is insolvency, the occurrence of an assignment for the benefit of creditors or bankruptcy. If the reason for termination, cancellation, nonrenewal or substantial change in competitive circumstances is nonpayment of sums due under the dealership, the dealer shall be entitled to written notice of such default, and shall have 10 days in which to remedy such default from the date of delivery or posting of such notice."

III. In July of 1975, Airborne's Milwaukee representative and Kania entered into an agreement with the plaintiff being given the right of first refusal with regard to Airborne's delivery service needs in the metro Milwaukee area and with the further right to deliver freight privately for anyone not in competition with Airborne.[3] However, it was expressly agreed that this right (first refusal) did not import a grant of an exclusive territory to Kania.[4] Additionally, it was stated that since "Airborne has developed customer good will through advertising and good repu 'ation which will benefit the Contractor [Kania]," Kania would be granted the right to use this good will and advertising, if he so elected, in the conduct of his business provided he disclosed that he was acting as an independent agent transporting cartage for himself and for Airborne.

"2. Contractor, if it so elects, shall have the right to use the Airborne name and logotype on Contractor's vehicle(s). Contractor, if it so elects, may use Airborne's

[3] Paragraph 12 of the contract reads as follows:

"12. Nothing herein shall prevent Contractor from performing any transportation services for any other person, firm or company, except that contractor shall not engage in other transportation of air freight unless otherwise agreed upon in writing by Airborne and Contractor."

[4] "11. Airborne and Contractor agree that Contractor's primary services area shall be the area specified in Schedule 'A'. It is agreed and understood by and between Airborne and Contractor that the aforesaid primary service area is not a grant of exclusive territory to Contractor nor a restriction on the operations of Contractor. In the performance of services under this contract, Contractor will use its best efforts to promote the maximum efficiency and utility to the public of the service and in the primary service area herein contemplated. Contractor will perform such transportation services in the most expeditious manner possible, and in return therefor Airborne agrees that Contractor shall have the right of first refusal to any pickup or delivery available within the aforesaid primary service area."

goodwill and name in Contractor's business, including advertising materials and sales aids, and Airborne agrees to furnish and allow use of said advertising materials and sales aids at no cost to Contractor. If Contractor elects to use Airborne's name or logotype in connection with its business, Contractor shall in each instance of the use of said name or logotype disclose that it is acting as an independent cartage agent for Airborne."

IV. The agreement also specifically provided that Kania was not an employee[5] but an independent contractor (non-agent),[6] and the agreement did not purport to

[5] Paragraph 14 of the contract provides as follows:

"14. . . . It is expressly agreed and understood that Contractor shall not be considered under the provisions of this agreement or otherwise as having any employee status with Airborne, or as being entitled to participate in any plans, distributions or benefits extended by Airborne to its employees."

[6] Paragraph 1 of the contract provides as follows:

"1. Contractor shall, as an independent contractor, provide break bulk, transfers, pickup, transport and delivery of shipments to and from the airport(s) serving the aforementioned city to consignees, and from consignors to said airport(s) and arrange necessary customs clearances, as specified in Schedule 'A', subject to Airborne's then effective tariffs on file with the Civil Aeronautics Board, and in the event of any conflict such tariffs shall control. All transactions handled hereunder shall be at Contractor's sole discretion and control as to the manner and means of performance including but not limited to the hours and days of work by Contractor and its employees, and the selection and supervision by Contractor of its employees."

Paragraph 14 of the contract also provides as follows:

"14. This agreement does not constitute the Contractor an agent, legal representative, joint venturer or partner of Airborne for any purpose whatsoever, it being understood between the parties hereto that Contractor is to act as an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of Airborne, or to create any obligation express or implied on behalf of Airborne. . . ."

Other contractual provisions evincing an intent that Kania was to be a non-agent independent contractor are as follows:

Paragraph 3 provides as follows:

create a "franchise' or "dealership." Further, the contract provided that either party could cancel the contract with 30 days' written notice to the other party and without cause.[7]

V. Following the execution of the contract, the plaintiff, at Airborne's request, elected to use Airborne's trade name on his vehicles. Accordingly, Kania's trucks were painted with Airborne's logotype and corporate colors. The cost of painting the plaintiff's vehicles was shared by the defendant and Kania, but the costs of inscribing the logo on the trucks was assumed exclusively by Airborne. Mr. Locke testified that Airborne's purpose in having its name on Kania's trucks was to advertise and promote business. Although Kania's vehicles bore Airborne's name, they as well advertised and were known as Glenn's Cartage Service/Glenn's Air Freight (GCS/GAF) with his name and address (Kania's) appearing on the cab door of each truck.

---

"Contractor, at its sole expense, shall furnish, operate and maintain in good working condition and suitable appearance adequate and satisfactory motor truck equipment, provide all necessary drivers and helpers, procure necessary titling, licensing, permits and registration, furnish all supplies and bear all costs necessary for such transportation. All persons employed by Contractor to perform services for Contractor hereunder shall be subject to the exclusive control and direction of Contractor, it being the intention of the parties that the Contractor shall be and remain an independent contractor."

Paragraph 10 provides as follows:

"Contractor shall not incur any indebtedness, expense or cost in the name of Airborne or on its behalf."

[7] "15. This agreement may be cancelled for any reason by either party upon thirty days' written notice, and may be cancelled for any breach of its terms at any time upon written notice. Upon cancellation of this agreement as above provided, neither party hereto shall be under any further obligation to the other, except that such cancellation shall not relieve either party of any obligation theretofore incurred."

VI. Kania serviced his own customers as well as fulfilling substantially all of Airborne's metropolitan Milwaukee service needs. The plaintiff would bill Airborne for its services and Airborne would in turn send a separate statement to its customers. Airborne's delivery charge to its customers was based on the national tariff rate and was independent and separate from the amount Airborne paid Kania under the terms of their contract. Kania was neither allowed to bill nor receive direct payment for the delivery service provided except when collecting monies for C.O.D. shipments.[8] Further, Kania did not share in Airborne's net business profits or losses. The plaintiff was paid at a set rate for deliveries within a prescribed area. Kania received weekly reimbursement from Airborne for the delivery services performed regardless of whether or not Airborne had received payment from its customers.[9]

VII. While handling the defendant's local delivery service, Kania's employees wore Airborne uniforms and would often deliver Airborne's various business forms

[8] Paragraph 9 provides in part as follows:

". . . Contractor shall collect all money on direct shipments delivered by Contractor on behalf of Airborne; and shall promptly remit to Airborne all such moneys, checks, drafts, or other instruments belonging to Airborne or collected for its account or the account of customers. Contractor shall not release any C.O.D. or F.C.C.O.D. shipments to a consignee until the payment by such consignee of the total charges due thereon has been received by Contractor in cash, or valid cashier's check, certified check or United States Postal money order."

[9] Paragraph 4 provides as follows:

"Airborne shall pay for the services furnished to it in accordance with this agreement at the rates set forth in Schedule 'A' attached hereto and incorporated by reference herein. Contractor shall submit weekly statements for its services to Airborne by the Tuesday following the week in which the services were rendered. Contractor shall not be entitled to receive any portion of any charges made by Airborne to its shippers."

and promotional materials to the defendant's customers for their use in obtaining Airborne's services if they so desired. Additionally, Kania offered testimony that he instructed his employees to look for commercial enterprises that would be interested in Airborne's services and they, on occasion, informed the defendant's sales people of potential customers, but he failed to offer any proof that Airborne's business was increased as a result of this activity.

VIII. In the years following the execution of the agreement, the gross receipts from Kania's cartage service for Airborne and others increased from $79,000 in 1975 to $330,000 therefrom in 1978. Kania estimated that his gross receipts for his 1979 fiscal year, including his own independent cartage service, would be approximately $450,000. This growth in the plaintiff's business was attributable to Airborne as 80 to 85% of his gross receipts in 1978 and 1979 were derived from services performed for the defendant, pursuant to the agreement.

At the conclusion of the evidentiary hearing, the trial court ruled from the bench that the cartage agreement did not create a "dealership" within the purview of ch. 135, Stats., as *a matter of law,* for it failed to fulfill the requirement of a community of interest, and denied Kania's motion for injunctive relief under sec. 135.06, Stats. The defendant thereupon moved for an order dismissing the plaintiff's complaint and the court granted the motion reaffirming its prior ruling that the cartage agreement failed to create a community of interest relationship within the definition of a dealership. Written orders consistent with the court's oral rulings and a judgment dismissing the plaintiff's complaint were entered. The plaintiff appealed from the judgment and orders, and the court of appeals affirmed the trial court.

*Issues*

1. Did the trial court abuse its discretion in denying the plaintiff's motion for a temporary injunction under sec. 135.06, Stats?

2. Did the trial court err in dismissing the plaintiff's complaint and granting judgment as a matter of law in favor of the defendant?

I. Abuse of Discretion.

Kania contends that the circuit court's failure to grant him a temporary injunction under sec. 135.06, Stats., was an abuse of discretion. He, in essence, argues that although the trial court determined ch. 135, Stats., and the relief afforded thereunder was not available to him, the court, nevertheless, should have considered whether the facts presented a proper case for the granting of a temporary injunction. The plaintiff further contends that the failure of the court to address the question of whether or not to grant a temporary injunction pursuant to sec. 135.06, Stats., was an abuse of discretion stating that ". . . the trial court abused its discretion by failing to exercise its discretion when it determined that ch. 135 did not apply."[10]

We conclude that the plaintiff's argument is without merit because the trial court's denial of the temporary injunction was not premised upon a discretionary act,

---

[10] The trial court did not consider whether it would be proper to issue a temporary injunction in this case, stating:

"And so without getting into the question of whether—I don't think it's necessary to reach obviously the question of the injunction with injunctive relief because of the court's ruling that Chapter 135 does not apply to the agreement in question. The agreement in question provides for a method of termination of the contract for the service between parties. That has been complied with in that the 30 days notice has been provided. There has been no indication to the contrary, so I'm left with the conclusion that that in fact has been complied with. That being the case, the request for the injunction would be denied."

but rather, the court ruled it was a question of law relating to the construction and application of the dealership definition recited in ch. 135, Stats.

The language contained in sec. 135.06, Stats., clearly demonstrates that the injunctive relief afforded thereunder is available to "dealers" only, for it reads:

"If any grantor violates this chapter, a *dealer* may bring an action against such grantor . . . and the *dealer* also may be granted injunctive relief. . . ." (Emphasis supplied.) Sec. 135.06, Stats.

Black's *Law Dictionary* defines a dealer as:

"In the popular sense, one who buys to sell; not one who buys to keep, or makes to sell. . . . (359, 5th ed. 1979) The term includes one who carried on the business of selling goods, wares, and merchandise, manufactured by him . . ." *Id.* at 521 (3rd ed. 1933).

The Wisconsin Statutes defines a dealer as:

". . . a person who is the *grantee*[1] *of a dealership* situated in this state." (emphasis supplied). Sec. 135.02 (2), Stats., defines a dealership as:

" 'Dealership' means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise."

---

[1] Grantee is not defined in ch. 135, Stats. However, a "grantee" is "One to whom a grant is made." Black's *Law Dictionary* 630 (5th ed. 1979). Grant is defined as "To bestow; to confer upon someone other than the person or entity which makes the grant . . . To bestow or confer, with or without compensation, a gift or bestowal by one having control or authority over it, as of land or money. (Cites omitted.) *Id.* at 629.

Thus, a motion for temporary injunctive relief under sec. 135.06, Stats., presents two questions: first, does the party requesting the relief come within the definition of a grantee of a dealership, as set forth in sec. 135.02(2) and (5), Stats.; and second, If the first question is answered in the affirmative, then, do the facts of the case entitle that party to such relief?

The first question requires a construction of the definition of the term "dealership" as set forth in sec. 135.02 (2), Stats., and requires the court to determine whether a party (Kania) was a grantee of a ch. 135 dealership given the following facts: (1) is a hired non-agent, non-employee independent contractor; (2) performed a local cartage service for an air freight forwarder (Airborne) combined with his own independent cartage business; (3) neither sold the local cartage service to the air freight forwarder's customers nor directly billed them; (4) was paid on a weekly basis regardless of whether Airborne received payment from its customers as of that date; (5) was paid at a set rate for each delivery within a prescribed area rather than at a percentage of Airborne's charge (national tariff rate) to its customers; (6) did not share in the employer's profits or losses or bear a risk of loss for nonpayment; and (7) approximately 80% of his business consisted of hauling Airborne's freight; and (8) used his own trucks with his complete business identification on them as well as Airborne's logotype. Our holdings in *Bucyrus-Erie Co. v. ILHR Dept.*, 90 Wis.2d 408, 417, 280 N.W.2d 142 (1979); *Milw. Fed. of Teachers, Local No. 252 v. WERC*, 83 Wis.2d 588, 598, 266 N.W.2d 314 (1978); *Robinson v. Kunach*, 76 Wis.2d 436, 446, 251 N.W.2d 449 (1977), recite that the construction of a statute or the application of a statute to a particular set of facts is a question of law, and thus does not allow for the exercise of discretion on the part of

the trial court. Once the court has determined that the plaintiff is not the grantee of a dealership, it has no choice but to deny the motion for a temporary injunction as the injunctive relief authorized in sec. 135.06, Stats., is reserved exclusively for those coming within the parameters of the definition of a dealership as set forth in ch. 135, Stats.

That is to say, the question of the proper exercise of the trial court's discretion in granting or denying the motion for a temporary injunction[12] pursuant to sec. 135.06, Stats., does not arise until the court makes an initial determination that the party requesting the injunctive relief is a dealer as defined in sec. 135.02(5).[13]

In the present case, the trial judge found that Kania was not the grantee of a dealership within the parameters of the dealership definition in sec. 135.02(2), Stats. Consequently, the court had no choice but to deny the plaintiff's motion for a temporary injunction under this statute. Thus, we hold that the court's denial of this motion is not an abuse of discretion as it pertains to a question of law and not to a discretionary act.

---

[12] A trial court's determination to issue or refrain from issuing a temporary injunction is a matter within the trial court's discretion. *Wis. Ass'n. of Food Dealers v. City of Madison*, 97 Wis.2d 426, 429, 293 N.W.2d 540 (1980); *Waste Management, Inc. v. Wis. Solid Waste Recycling Authority*, 84 Wis.2d 462, 465, 267 N.W.2d 659 (1978); *Werner v. A.L. Grootemaat & Sons, Inc.*, 80 Wis.2d 513, 519, 259 N.W.2d 310 (1977); *Aqua-Tech v. Como Lake Protec. & Rehab. Dist.*, 71 Wis.2d 541, 545, 239 N.W.2d 25 (1976).

[13] The plaintiff admits as much, stating, "At the hearing on the motion for a temporary injunction, the trial court had a duty to make a preliminary factual determination whether Kania was a dealer within the purview of Chapter 135." Pl.-App.-Pet's. Br., p. 12.

## II. Dismissal of the Complaint.

The defendant made a motion to dismiss the complaint based upon the theory that it failed to state a claim for which relief could be granted. A motion to dismiss, pursuant to sec. 802.06(2)(f), Stats., supported by matters outside the pleadings, *i.e.,* testimony and affidavits, is to be treated as one for summary judgment under sec. 802.-02. *See:* sec. 802.06(2).[14] Sec. 802.08(2), requires that summary judgment be rendered if ". . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." "When called upon to review the granting or denial of a summary judgment motion, this court must apply the standards set forth in sec. 802.08, in the same manner as trial courts. *Wright v. Hasley,* [86 Wis.2d 572, 579, 273 N.W.2d 319 (1979)]." *Heck & Paetow Claim Service, Inc. v. Heck,* 93 Wis.2d 349, 356, 286 N.W.2d 831 (1980). *See also: Maynard v. Port Publications, Inc.,* 98 Wis.2d 555, 558, 297 N.W.2d 500 (1980).

The initial step in the review of an order granting a motion for summary judgment is an examination of the pleadings to determine if the complaint states a claim upon which relief may be granted. *Maynard, supra* at 558; *Grams v. Bass,* 97 Wis.2d 332, 339, 294 N.W.2d 473 (1980). However, the defendant in its argument and brief before this court does not contend that the complaint failed to state a claim in violation of the Wiscon-

---

[14] The pertinent portion of sec. 802.06(2), Stats., reads:

"If on a motion asserting the defense described in (f) to dismiss for failure of the pleading to state a claim upon which relief can be granted, or on a motion asserting the defenses described in (h) or (i), matters outside of the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in s. 802.08, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by s. 802.08."

sin Fair Dealership Law.[15] Therefore, in the absence of such a claim, we proceed to a review of the propriety of a court to grant a motion for summary judgment with an examination of the evidence adduced at the hearing for a temporary injunction in order to determine whether there is a genuine issue of material fact.

[15] The material allegations of the complaint were as follows:

"1. That on or about the 19th day of July, 1975, the above named plaintiff and defendant entered into a written agreement whereby the plaintiff was granted the right to sell services and to use the defendant, Airborne Freight Corporation's trade name, commercial symbol and advertising in selling such services.

"2. That said written agreement entered into on July 19, 1975 created a community of interest between the plaintiff and defendant, to-wit: the defendant agreed to bill the customer for the services rendered and further agreed to pay the plaintiff out of the monies collected from its customers pursuant to the terms of the written agreement; that the written agreement of July 19, 1975 contemplated that both parties to this action would have a continuing financial interest in the marketing of the services contemplated by the agreement and that both parties anticipated that they would make a profit from their relationship.

"3. That the defendant, Airborne, threatens to terminate the dealership relation between the parties created by the July 19, 1975 agreement on April 16, 1979; that the defendant's termination is upon thirty days notice; that said threatened termination is without good cause;

"4. That said threatened termination is not in compliance with the provisions of Section 135.04, Wisconsin Statutes; that said section requires at least ninety days prior written notice of termination; that said section further requires that the dealer, the plaintiff here, be given sixty days in which to rectify any claimed deficiency which is alleged to constitute good cause for termination; that the defendant, Airborne, has not given ninety days notice nor has the defendant, Airborne, furnished the plaintiff with written reasons for cancellation or termination.

"5. That this action is brought pursuant to the provisions of Chapter 135 of the Wisconsin Statutes; that plaintiff has been damaged by defendant's violation of the provisions of said Chapter and seeks the reasonable attorney's fees for bringing this action, as well as the injunctive relief provided for at Section 135.06, Wisconsin Statutes."

As stated in *Heck & Paetow Claim Service, Inc. v. Heck, supra,*:

"The purpose of summary judgment is to obviate the need for a trial where there is no genuine issue as to any material facts. It is a judgment rendered on the merits without a trial. *Truesdill v. Roach,* 11 Wis.2d 492, 499, 105 N.W.2d 871 (1960); *Town of Blooming Grove v. City of Madison,* 275 Wis. 328, 333, 81 N.W.2d 713 (1957). The summary judgment procedure does not function as a substitute for a trial of any genuine issue of material fact, but permits a decision based on affidavits, records and for depositions. *Alonge v. Rodriquez,* 89 Wis.2d 544, 553, 279 N.W.2d 207 (1979); *Lecus v. American Mutual Ins. Co. of Boston,* 81 Wis.2d 183, 190, 260 N.W.2d 241 (1977). The party moving for summary judgment must demonstrate that a trial is not necessary and established a record sufficient to demonstrate to the satisfaction of the court that there is no triable issue of material fact on any issue presented. *Hilkert v. Zimmer,* 90 Wis.2d 340, 342, 280 N.W.2d 116 (1979); *Kraemer Bros., Inc. v. United States Fire Ins. Co.,* 89 Wis.2d 555, 565–66, 278 N.W.2d 857 (1979); *Wright v. Hasley,* 86 Wis.2d 572, 577, 273 N.W.2d 319 (1979). Any reasonable doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Kraemer Bros., Inc. v. United States Fire Ins. Co., supra* at 566. If the trial court has determined the movant has proved to the court's satisfaction that there is no genuine issue of material fact as a matter of law, then the trial court should enter judgment. *Wright v. Hasley, supra* at 578–79. *See:* sec. 802.08(3), Stats." *Id.* at 355–56.

The underlying dispute in this case is, does the cartage agreement create a "dealership" within the meaning of that term as set forth in sec. 135.02(2), Stats. Kania contends that this is a question of fact and not of law. We disagree. We have previously stated in *Bucyrus-Erie, supra; Milw. Fed. of Teachers, supra; Robinson, supra,* the construction of the language in a statute or

the application of the same to a particular set of facts presents a question of law, not of fact. Also, in the absence of a claim of ambiguity, which might require extrinsic evidence, the construction of a written contract is only a question of law for the court. *Schlosser v. Allis-Chalmers Corp.*, 86 Wis.2d 226, 244, 271 N.W. 2d 879 (1978); *Pleasure Time, Inc. v. Kuss,* 78 Wis.2d 373, 379, 254 N.W.2d 463 (1977). Thus, in the absence of Kania contending that the terms of the contract were ambiguous, and his failure to isolate a material factual dispute, we hold that the issue confronting this court is one of law, namely, whether the defendant-respondent Airborne Freight Corporation is entitled to the entry of a summary judgment as a matter of law.

The trial court dismissed Kania's complaint and entered judgment accordingly, ruling that the terms of the cartage agreement did not create a dealership within the statutory language of ch. 135. The parties agree that the dealership definition in sec. 135.02(2), Stats., contains the following elements:

1. a contract or agreement between two or more persons;
2. by which a person is granted
   a. the right to sell goods or services;
   b. the right to distribute goods or services; *or*
   c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; *and*
3. in which there is a community of interest in the business of
   a. offering goods or services;
   b. selling goods or services; or
   c. distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

The parties further agree to the existence of a contract, but they disagree as to whether the statutory elements of the grant of a right to distribute Airborne's services or use Airborne's trade name, trademark, etc., and a community of interest in the business of offering, selling or distributing Airborne's services is present in their contractual relationship.

The trial court found that the agreement lacked the requisite element of a community of interest because the defendant had no financial interest in the operation of the plaintiff's business, and because the relationship was best characterized as a vendor/vendee relationship rather than a dealership. It stated:

"I think the break comes in the area of community of interest with the defendant, the defendant in traditional dealership or in franchise situations, the franchisor. The dealer is in fact in the sole business of—that doesn't mean he doesn't do other things—but the relationship between he and the grantor of the franchise or dealership is in the business of . . . the selling of services—of the goods or services of the grantor, and in this situation the plaintiff is fulfilling—merely fulfilling a cartage contract for hauling or delivery of goods which is the service provided by the defendant to the third party. *There is no financial interest of the defendant in the operation of the plaintiff's business.* The plaintiff is clearly, I think, more interested in the operation of the grantor's business from the standpoint of the correlating increase in deliveries that the grantee might be making. So, what we have here is the relationship of the plaintiff selling its services to the defendant, as opposed to the plaintiff selling the defendant's services to the public or third party. I think that's a necessary chain that does not exist in this fact situation. And for that reason there's a vendee-vendor relationship rather than a dealership, and the community of interest in the dealership concept is as I indicated . . . It's selling the grantor's goods or services to the third party or public customers. The typical or traditional relationship is that of the grantor selling to the grantee with the grantee then selling to the third party.

That does not exist. The only customers that the plaintiff has as it relates to this agreement and its relationship are the customers of Airborne which are routed to the plaintiff for the purpose of the plaintiff providing the defendants service thereto."

The court of appeals affirmed, agreeing with the trial court's finding that the contractual relationship between Kania and Airborne lacked the statutory community of interest element, stating:

"No community of interest existed between GAF [Kania] and Airborne. Airborne's contracts with its customers and receipt of payments from them was independent of the arrangement between Airborne and GAF. . . . GAF offered services to Airborne for which it was paid regardless of payment to Airborne by Airborne customers. Further, GAF was free to offer its services to others."

Next, we address the question of whether the agreement recited a necessary element of a dealership, namely, does it possess a community of interest between Airborne and Kania in the offering, selling or distributing of Airborne's services.

This court is confronted with the question of the construction and application of the "dealership" and "community of interest" definitions contained in the Wisconsin Fair Dealership Law. The purpose of statutory construction or "the general objective [in construing a legislative enactment] is to give effect to the legislative intent reflected in the language." *County of Columbia v. Bylewski*, 94 Wis.2d 153, 168, 288 N.W.2d 129 (1980). It is a basic rule of statutory construction that "in construing statutes, effect is to be given, if possible, to each and every word, clause and sentence in a statute, and a construction that would result in any portion of a statute being superfluous should be avoided wherever pos-

sible." *County of Columbia v. Bylewski, supra* at 164. In addition, in construing a statute "we attempt to find the common sense meaning and purpose of the words employed. . . ." (citations omitted). *State ex rel. Lynch v. Conta,* 71 Wis.2d 662, 667, 239 N.W.2d 313 (1976). Accordingly, statutes are to be construed to avoid unreasonable and absurd results. *Wis. Environmental Decade v. Public Service Comm.,* 84 Wis.2d 504, 528, 267 N.W. 2d 609 (1978). Further, "[w]hen interpreting statutes, non-technical words used in a statute are to be given their ordinary and accepted meaning when not specifically defined, and this meaning may be ascertained from a recognized dictionary." (Citation omitted.) *State ex rel. First National Bank & Trust Co. v. Skow,* 91 Wis.2d 773, 781, 284 N.W.2d 74 (1979). *See also:* sec. 990.01 (1), Stats.

Community of interest is defined in sec. 135.02(4), Stats:

" 'Community of interest' means a continuing financial interest between the grantor[16] and grantee in either the operation of the dealership business or the marketing of such goods or services."

"Statutory definitions should be applied in the construction of a statute of which they are a part." *Price County Telephone Co. v. Lord,* 47 Wis.2d 704, 719, 177 N.W.2d 904 (1970). *See also: Schoolway Transp. Co. v. Div. of Motor Vehicles,* 72 Wis.2d 223, 231, 240 N.W.2d 403 (1976). Therefore, we must look to the definition of a community of interest as set forth in sec. 135.02(4), Stats., to determine whether the community of interest element is present in the contractual relationship between Airborne and Kania.

The definition of a community of interest is set forth in the disjunctive in sec. 135.02(4), Stats., as a continu-

[16] "Grantor means a person who grants a dealership." Sec. 135.02(3), Stats.

ing financial interest between the grantor and grantee in: (1) the operation of the dealership business, *or* (2) the marketing of such goods or services (meaning the grantor's, Airborne, goods or services). Thus, the question is—was there a continuing financial interest between Airborne and Kania in the operation of the alleged dealership business of providing a local delivery service or in the marketing of Airborne's local component of its air freight business?

In construing the definition of a community of interest we must first ascertain what is meant by a continuing financial interest *between* the grantor and grantee. Webster's *New Collegiate Dictionary* 106 (1977) defines "between" in pertinent part as: "1a: by the common action of: jointly engaging . . . b. in common to: shared by . . ." Thus, the definition of a continuing financial interest between the grantor and the grantee set forth in sec. 135.02(4), Stats., necessarily requires a shared financial interest and, therefore, both Airborne and Kania must share a continuing financial interest in either the operation of the dealership business or the marketing of the grantor's goods or services if the plaintiff is to satisfy the requirements of the community of interest element in the definition of a dealership.

Considering the question of whether there was a continuing financial interest in the *marketing*[17] of Airborne's local delivery service, we note that Airborne had such an interest. The question is, did Kania satisfy the element of a continuing financial interest in the marketing of Airborne's services?

The plaintiff submits that he possessed a continuing financial interest in the marketing of Airborne's local

---

[17] Marketing is defined as "1. the act or process of selling or purchasing in a market. 2: an aggregate of functions involved in moving goods from producer to consumer." Websters *New Collegiate Dictionary* 704 (1977).

delivery service as he benefited from an increased demand for the same. He also claims that he aided in the marketing of the service as his employees, on occasion, informed Airborne's sales people of potential new customers as well as delivering Airborne's advertising literature to Airborne's customers.

While it is true that Kania personally does have a general economic interest in the promotion of Airborne's delivery service solely because he stands to benefit from a greater demand for Airborne's services and thus receive greater personal business income, we do not agree that the legislature intended that the continuing financial interest in the marketing of the grantor's (Airborne) services element of the community of interest definition could be satisfied by this type of interest. Kania's construction of a community of interest is far too elastic or broad to be approved.

The record establishes that Kania was hired and performed only in the capacity of an independent contractor and not as an employee or agent. He did not receive a percentage share of Airborne's revenues, rather, he was paid at a set rate for deliveries within a prescribed geographical area. Further, he was not subject to a risk of loss, for the contract provided that he be reimbursed on a weekly basis for his services whether or not Airborne had received payment. Also, Kania neither sold Airborne's services nor directly billed Airborne's customers and did not set or adjust prices nor solicit sales from Airborne's current customers. Additionally, Kania was conducting his own independent cartage freight business in his own trucks while transporting Airborne's freight to and from the airport. Therefore, we hold that Kania does not share in the requisite continuing financial interest in the marketing of Airborne's services and his only interest can be summed up in his own words "What was good for Airborne was good for Kania." Thus, if

we were to construe sec. 135.02(4), Stats., as Kania suggests, it would lead to the absurd and unreasonable result of including every vendor/vendee relationship under the protective veil of ch. 135, and we decline to do so.

The fact that Kania's employees delivered promotional material and business forms to Airborne's customers and, on occasion, gave Airborne's sale people unsubstantiated leads as to new customers does not elevate his general economic interest to the level of a continuing financial interest in the marketing of the local delivery service.

Kania also contends that the cartage agreement created a continuing financial interest between himself and Airborne in the operation of the alleged dealership. It is undisputed that the plaintiff possessed an interest in the operation of Airborne's local delivery service in that a substantial portion, but not all, of Kania's gross transportation receipts were derived from his contractual relationship with Airborne. However, the defendant, Airborne, points out that they possessed no continuing financial interest in the operation of Kania's local cartage service.

The plaintiff argues that Airborne's request that Kania use its logo and that Airborne shared the cost of painting Kania's vehicles as well as shouldered the entire charge for the application of Airborne's logo thereon, together with the fact that Airborne showed promotional films and gave "pep" talks to Kania's employees demonstrates that Airborne had a continuing financial interest in the operation of his local cartage business. In essence, the plaintiff is claiming that Airborne's interest in his business was both continuing and financial as he was identified with and performing a service for Airborne; thus, if he were unable to show a profit as a result of his operating an inefficient cartage service, Airborne would therefore suffer revenue and business losses.

The phrase "a continuing financial interest between the grantor and grantee . . . in the operation of the dealership business . . ." connotes an interest or stake that both the grantor and grantee share in the profitability of the alleged dealership business.

In this case, although the plaintiff maintains that his cartage service was the "dealership business," the fact of the matter is that the dealership business, if it can be characterized as such, was solely Airborne's local pick up and delivery service. Having defined the "dealership business," we consider whether both Airborne and Kania have an interest in the profitability of this business.

The record establishes that Kania's only participation in the operation of Airborne's local delivery service was the physical transportation of parcels to and from the airport. Kania was hired as an independent contractor and was paid for his transportation services on a weekly basis at a specified rate. He did not share in Airborne's business profits or losses and also bore no risk for losses incurred resulting from Airborne's non-paying customers. Further, Kania was not authorized to sell Airborne's services and did not bill Airborne's customers for his services, but, rather, looked to Airborne for payment. Additionally, the "cartage agreement," did not grant Kania an exclusive territory, only a right of first refusal, for Airborne's delivery service needs in the Milwaukee metropolitan area and also allowed him to perform transportation services for other firms or businesses with Airborne's prior written approval. Although Kania was interested in the operation of Airborne's business to the extent that a substantial amount of his gross receipts were derived from cartage services performed for Airborne, he did not share in the profitability of Airborne's business as Airborne's charge to its customers was based on the national tariff rate while the

reimbursement to Kania was pursuant to the terms of the contract, specifically, a set rate per delivery for specified locations in the Milwaukee metropolitan area. The cartage contract as written and performed appears to put the plaintiff more in the category of a piece work employee rather than a dealer under ch. 135. The more packages or parcels of freight Kania delivers to or from the airport, the greater his income, rather than a dealer who openly solicits and sells services or products and is paid on a commission basis, as compared with a flat rate payment per geographical area. Thus, considering the total relationship of the parties, we hold that Kania failed to establish a continuing financial interest in the operation of Airborne's delivery service and, therefore, the plaintiff failed to fulfill the statutory element of a community of interest in the "offering, selling or distributing" of Airborne's services.

Kania calls our attention to two federal decisions, *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977) and *Al Bishop Agency, Inc. v. Lithonia-Division of Nat. Service Ind., Inc.*, 474 F. Supp. 828 (E.D. Wis. 1979), where the courts found sufficient indicia of the community of interest element to bring the parties within the purview of ch. 135, Stats. We distinguish *Boatland, supra,* and *Al Bishop Agency, supra.* In *Boatland, supra,* the plaintiff, Boatland, sold Mercury Marine outboard motors manufactured by Mercury Marine, a division of Brunswick Corporation, pursuant to a "dealership" contract. Brunswick contended that the WFDL did not apply because once Boatland bought the Mercury outboard motors, Brunswick's financial interest in the operation of Boatland's business ended and thus, the parties no longer had a community of interest with one another. The court rejected this argument on the reasoning that the promotion and services clauses in the contract supplied Brunswick with the requisite continuing

financial interest in Boatland's promotion and service operations. It stated:

"Both clauses effectively provide for performance standards which Boatland had to maintain in order to comply with the terms of the contract. By these clauses Brunswick had retained an interest, a 'foot in the door,' on how Boatland was performing in promotions and services. In fact, Brunswick's branch managers came to the Boatland store numerous times each year to review Boatland's performance and to look at its promotion efforts of their Mercury product. Admittedly, these contract clauses did not directly bring in sales profits per se to Brunswick, but they directly related to Brunswick's goodwill in its Mercury products, a financial asset in its balance sheet. Thus, Brunswick continued to have sufficient stake in Boatland's promotions and service operations to be deemed to have had a 'continuing financial interest' in the operation of Boatland's business." *Id.* at 824.

In the present case, the cartage agreement did not require Kania to promote Airborne's services. The plaintiff was only required to use his best efforts to perform the local delivery service efficiently and expeditiously in return for the right of first refusal in his designated primary service area[18] and received payment on a weekly basis regardless of whether Airborne received payment from its customers.[19] Any promotional efforts undertaken by Kania or his employees to promote Airborne's services were voluntary and not required under the contract. On the other hand, in *Boatland*, the contract required the plaintiff to maintain certain promotion and service standards, and, in fact, Brunswick's branch managers enforced these standards with numerous periodic inspections of Boatland's stores to scrutinize Boatland's performance in the area of servicing and promot-

---

[18] *See* n. 4, *supra* at 751.
[19] *See* n. 9,, *supra* at 754.

ing their Mercury outboard motors. Further, Kania did not purchase Airborne's services and sell them to third parties as did Boatland. On the contrary, Airborne purchased Kania's transportation services and promoted and sold its air freight services through the use of a local independent contractor, Kania.

In *Al Bishop Agency, Inc., supra,* the plaintiff sought a preliminary injunction enjoining the defendant from terminating its agency claiming that the termination was without good cause and without adequate notice, thus in violation of the WFDL. The plaintiff encouraged architects and engineers to specify the use of the defendant's products in their building projects and further arranged actual sales, receiving a commission for the same, although it did not bill customers or sell from stock.

In considering the propriety of granting the temporary injunction, the court ruled that the plaintiff was a dealer. In so doing, the court relied on the following aspects of the plaintiff's agency:

"First, as indicated earlier, plaintiff does more than just represent defendant's products, it is instead involved in the actual solicitation of offers to purchase. While the evidence shows that plaintiff neither bills customers nor otherwise handles the products sold, these services generally being handled by a distributor, it is clear that plaintiff is involved in the solicitation of actual sales on a one-to-one basis. Second, plaintiff's business is closely entwined with that of defendant. Once the sales are made, plaintiff performs customer service functions by making certain the eventual purchaser is satisfied. Furthermore, plaintiff holds itself out as an agent for defendant by having defendant's name on its business cards and by being well-known as an agent for defendant.

"Taking the relationship between plaintiff and defendant and the extensive functions performed by plaintiff into consideration, this Court is of the opinion that plaintiff is a dealer within the meaning of chapter 135." Id. at 832.

*Al Bishop Agency* is readily distinguishable from the facts of the present case in that Kania was neither authorized by the contract to solicit or sell Airborne's services nor did he perform any customer service other than the pickup and delivery of freight while acting as an independent contractor. Further, the plaintiff in *Al Bishop* held himself out and was well known as an agent for the defendant, Lithonia, whereas, in the case herein, the plaintiff, Kania, failed to offer proof that he held himself out as a sales agent for Airborne, and thus, the only inference that can be drawn is that Kania complied with the terms of the contract prohibiting him from so doing. In addition, Kania did not receive a commission for performing services for Airborne as did the plaintiff in *Al Bishop*, but received a flat rate of payment.

Kania argues that the ch. 135 dealership definition should be liberally construed in accord with the legislative intent expressed in sec. 135.025, Stats.:

"**135.025 Purposes; rules of construction; variation by contract**

"(1) This chapter shall be liberally construed and applied to promote its underlying remedial purposes and policies.

"(2) The underlying purposes and policies of this chapter are:

"(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

"(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

"(c) to provide dealers with rights and remedies in addition to those existing by contract or common law;"

He contends that an expansive construction of the definition of a dealership would encompass the contractual relationship between Airborne and himself. We do not agree with the plaintiff's claim that the legislature in-

tended the definitions in ch. 135 to be construed so liberally as to make ch. 135 applicable to the facts of this case. We agree with the common sense approach and reasoning of the federal district court in *H. Phillips Co. v. Brown–Forman Distiller Corp.*, 483 F. Supp. 1289 (W.D. Wis. 1980), where the court stated:

"[the] direction by the Legislature to the courts to construe and apply the statute [Chapter 135] liberally does not mean that the boundaries of its coverage should be construed expansively. That is to say, the Legislature has acted to protect 'dealers' from 'grantors' rather zealously, particularly with respect to the continuation of 'dealerships.' If a relationship is a dealership, the protections afforded the dealer are to be construed and applied liberally to the dealer. But the statute itself undertakes to draw a line to encompass the kinds of enterprises and relationships which are to enjoy such protection. There is no basis upon which the courts can provide that protection to enterprises and relationships which fall without the legislative line." *Id.* at 1291.

Moreover, this court recognizes that the right of free contract is a property right protected by both state and federal constitutions and should not be lightly impaired.[20]

[20] 16 Am. Jur. 2d, *Constitutional Law*, pp. 704–706, §373 provides:

"Although the term 'freedom of contract' does not appear in the Constitution, the right to enter into a contract, with some exceptions, is a liberty which falls within the protection of the due process clause of the Fourteenth and Fifth Amendments to the Constitution of the United States. It is also safeguarded by the constitutions of the states, and, by a constitutional guaranty of pursuit of happiness. In general it may be said that the privilege of contracting is both a liberty and a property right. And the right of a citizen of the United States resident in one state to contract in another is also a privilege protected by the privileges and immunities clause of the Fourteenth Amendment.

"Liberty of contract involves, as one of its essential attributes, the right to terminate contracts, subject only to civil liability for unwarranted termination."

The attitude of the judiciary toward the importance of an individual's right to contract is discussed in 17 Am. Jur.2d, Contracts, pp. 538–39, §178 as follows:

"The courts are adverse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. Rules which say that a given agreement is void as being against public policy are not to be extended arbitrarily, because 'if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced by courts of justice.' "

Thus, this court will not expand a common sense application of ch. 135 under the guise of the legislative language contained therein, "liberal construction," to an all expansive interpretation of the definitions of "dealership" and "community of interest" to include a piecework delivery man under sec. 135.02(2), Stats.

Having concluded that the contractual relationship between Airborne and Kania did not fulfill the statutory requisite of community of interest, and therefore the cartage agreement did not create a dealership within the parameters of ch. 135, Stats., we need not discuss the other disputed element of the dealership definition as our decision that the relationship between Airborne and Kania did not possess the necessary element of a community of interest disposes of this case.

*By the Court.*—The decision of the Court of Appeals is affirmed.