IN RE the MARRIAGE OF:

Lynne S. AYRES, Petitioner-Appellant,

v.

John D. AYRES, Respondent-Respondent.

Court of Appeals

*No. 98–3450. Submitted on briefs July 26, 1999.—Decided September 8, 1999.*

(Also reported in 602 N.W.2d 132.)

431

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Gary L. Bakke* of *Bakke Norman, S.C.* of New Richmond.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Michael S. Heffernan* of *Foley & Lardner* of Madison, and *Warren W. Wood* of *Warren W. Wood Ltd.* of New Richmond.

Before Cane, C.J., Hoover, P.J., and Gordon Myse, Reserve Judge.

MYSE, R.J.   Lynne Ayres appeals those portions of a divorce judgment that divide the marital property, set child support and establish limited-term mainte-

nance. Lynne contends that an agreement to divide property, executed five days before the divorce action was commenced, is an enforceable postnuptial agreement that would have provided her a substantially larger portion of the estate than the trial court awarded. She further contends that the court erred by departing from the child support guidelines in setting support for her two children and erroneously exercised its discretion in setting limited-term maintenance. Finally, Lynne argues that the court erred when it valued and divided shares of stock John owned. We conclude that the agreement between John and Lynne was a stipulation executed under contemplation of divorce and, therefore, was not enforceable until approved by the trial court. We also conclude that the court properly exercised its discretion in setting limited-term maintenance and child support, and that the court did not err in valuing and dividing John's stock. Therefore, the judgment is affirmed.

## BACKGROUND

Lynne and John Ayres were married over eleven years at the time the judgment of divorce was entered in September 1998. They are the parents of two children who were ages eight and six at the time the parties commenced the divorce action in August 1996.

John holds a bachelor's degree in industrial engineering and a master's degree in industrial administration. After earning his master's degree he worked from 1984 until 1996 for American Materials, Inc. (AMI), his family-owned business. During that time, John worked in various supervisory capacities, moving from managerial to administrative functions and eventually assuming the presidency of the corporation in 1992. John left his role and sold his interests in

AMI in 1996. The trial court found that John's current earning capacity outside the family corporation was $65,000 per year.

Lynne holds a bachelor's degree in marketing. After earning her degree, Lynne worked in industrial and pharmaceutical sales until April of 1991. Since that time, Lynne has worked as a full-time homemaker. The court found that Lynne's current earning capacity was $35,000 per year. Neither spouse contributed to the education of the other.

On August 23, 1996, after the parties had agreed to obtain a divorce but before the summons and petition for divorce were filed, the parties met with Lynne's attorney and prepared and executed a marital settlement agreement for the stated purpose of preparing for divorce. The agreement provided that it was a contract, binding on both parties. Five days following the execution of this agreement, Lynne filed the summons and petition for divorce. On October 15, after consulting with an attorney, John filed a document entitled "Withdrawal of Signatory Consent to Agreement," which purportedly withdrew John's consent to the marital settlement agreement.

The trial court validated John's withdrawal after concluding that the marital settlement agreement was a stipulation enforceable only after court approval. The trial court proceeded to exclude over $1,500,000 of property from the marital estate, finding that portion to have been gifted to John, and divided the remainder of the marital estate equally between the parties. The court also set child support at an amount substantially below that provided by the child support standards under § 767.25(1j), STATS., based on its finding that the standards would provide a windfall beyond that necessary for the reasonable support of the children.

Further, the court set maintenance payments for a limited-term of five years, requiring $2,916.67 per month for twelve months and then decreasing that amount proportionally for the next forty-eight months. Additional facts and specifics of the trial court's decision will be referred to as required.

## THE MARITAL ESTATE

### A. Marriage Settlement Agreement

We first address Lynne's claim that the marital settlement agreement executed prior to commencing the divorce action is a contractual postnuptial agreement enforceable as long as the agreement would not be inequitable to either party according to § 767.255(3)(L), STATS. That statute provides that among the factors a court shall consider when dividing property in a divorce is:

> Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

*Id.*

John replies that the agreement was one signed under immediate contemplation of divorce and thus must be governed by § 767.10 STATS. The relevant portion of § 767.10(1), provides:

> The parties in an action for annulment, divorce or legal separation may, *subject to the approval of the court*, stipulate for a division of property, for main-

tenance payments, for the support of children, for periodic family support payments under s. 767.261 or for legal custody and physical placement, in case a divorce or legal separation is granted or a marriage annulled. (Emphasis added.)

■

The parties disagree as to which of the two statutes applies to their marriage settlement agreement. This issue involves the application of legal standards to undisputed facts, a question of law we decide independently of the trial court. *See Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 758–59, 300 N.W.2d 63, 68 (1981).

In order to determine the nature of this agreement, we must analyze both the terms of the agreement itself and the undisputed factual circumstances giving rise to it. Lynne first contacted her attorney, Gary Bakke, regarding divorce on April 25, 1996. Following this first meeting, Lynne and Bakke had several conversations regarding various aspects of the divorce. Ultimately, Lynne made an appointment for 4 p.m. on August 23, to commence a divorce action. On that day, Lynne called Bakke to advise him that she and John had reached a full agreement on all issues and wished to have Bakke prepare a corresponding agreement. When the parties arrived at Bakke's office, Bakke explained to John that he was Lynne's attorney, that he could not give any legal advice to him and that John should retain another attorney before entering into any marital property agreement. John ignored the admonitions and responded that he wanted to proceed with making the agreement that he and Lynne had reached. Thereafter, various proposed drafts were undertaken until approximately 8 p.m. Bakke transcribed a final draft and edited the final net worth

agreement himself, which John read over, carefully corrected and ultimately signed.

The agreement divided the property owned by the parties but also included provisions regarding legal custody of the children, visitation, child support, maintenance, health insurance, debt payment and attorney fees. The agreement also provided:

> Both parties agree that the provisions of this agreement shall survive any subsequent judgment of divorce and shall have independent legal significance. This agreement is a legally-binding contract, entered into for good and valuable consideration. It is contemplated that, in the future, either party may enforce this agreement in this or any other court of competent jurisdiction.

This kind of agreement, attempting to settle the terms of divorce privately, was specifically contemplated by the Wisconsin Supreme Court in *Ray v. Ray*, 57 Wis. 2d 77, 82, 203 N.W.2d 724, 726 (1973). There the court recognized two different types of postnuptial agreements: "(a) family settlements, which contemplate a continuation of the marriage relation, and (b) separation agreements . . . which are made after separation *or in contemplation of a separation in the immediate future." Id.* (emphasis added). Lynne questions why "[t]he parties may enter into a binding contract about a hypothetical event which may or may not occur in the future, but they are not permitted to enter into a contract with respect to a current issue, where all of the facts are known to both parties." We do not. Courts have long treated postnuptial agreements differently from agreements executed for the purpose of facilitating divorce. Our supreme court has articu-

lated these differing policy considerations: the review of postnuptial agreements is:

> limited to the question of whether the agreement was fraudulently induced and in the absence of fraud or overreaching, they have been held binding on the courts. Radically different consequences and considerations come into play, however, when a court is requested to incorporate in its judgment the provisions of a separation agreement entered into at or *immediately prior to separation* and which attempts to limit rights and liabilities between the parties after a divorce.

*Id.* (emphasis added).

More recently in *Abitz v. Abitz*, 155 Wis. 2d 161, 177, 455 N.W.2d 609, 616 (1990), the court also articulated policy considerations supporting its active role in reviewing agreements prepared in anticipation of divorce. The family court "represents the interests of society in promoting the stability and best interests of the family." Based on this duty, the supreme court has stated that "there is no such thing in this state as a divorce by consent or agreement. The parties cannot by stipulation proscribe, modify, or oust the court of its power to determine the disposition of property, alimony, support, custody, or other matters involved in a divorce proceeding." *Ray*, 57 Wis. 2d at 84, 203 N.W.2d at 727 (quoting *Miner v. Miner*, 10 Wis. 2d 438, 443, 103 N.W.2d 4, 7 (1960)).

Lynne fails to offer any substantial legal support for her opposing argument that the agreement should be enforced as a contract. Rather, she points to her particular agreement's contractual language and thereby distinguishes her case from *Norman v. Nor-*

*man*, 117 Wis. 2d 80, 342 N.W.2d 780 (Ct. App. 1983). In *Norman*, the parties stipulated "to govern all aspects of their divorce." *Id.* at 81, 342 N.W.2d at 781. Their agreement, however, did not contain the contractual language found in this case. Because her agreement does, Lynne argues that *Norman* supports her contention that the agreement must be enforced as a contract.

However, we do not read *Norman* to allow a party to circumvent the court's third-party responsibilities and contravene legislative intent by adding contractual language to what is clearly an agreement signed in anticipation of divorce. The professed categorization of this document as a postnuptial agreement is not determinative as to the nature of the agreement. Moreover, the parties may not defeat the provisions of a statute by declaring the agreement to be something that it is clearly not.

Because this agreement was made in contemplation of a divorce, the agreement specifically referred to the impending divorce action and covered areas more typical of a divorce stipulation, we conclude that this document is a stipulation under § 767.10(1), STATS., and is not a postnuptial agreement. Because John withdrew his consent before any court approval, the agreement was unenforceable.

## B.    *Child Support and Maintenance*

Next, Lynne challenges the trial court's order for child support and maintenance. These matters are committed to the sound discretion of the trial court. *See Luciani v. Montemurro-Luciani*, 199 Wis. 2d 280, 294, 544 N.W.2d 561, 566 (1996). Whether the trial court properly exercised its discretion is a question of law.

*See id.* An appellate court will sustain a discretionary act if the trial court: (1) examined the relevant facts; (2) applied a proper standard of law; and (3) reached a conclusion that a reasonable judge could reach using a demonstrated rational process. *See id.*

■

With regard to child support, trial courts calculate the appropriate award by using the Department of Health and Social Services standards unless a party requests a deviation and the court finds, by the greater weight of the credible evidence, that the standards are unfair to the child or any party. *See* § 767.25(1j) and (1m), STATS. When a party challenges the application of HSS standards, the trial court shall exercise its discretion by considering the statutory factors enumerated in § 767.25(1m) and articulate the basis for its decision to either remain within the guidelines or allow a modification. *See Luciani*, 199 Wis. 2d at 295, 544 N.W.2d at 567.

■

Specifically, John challenged the rigid application of WIS. ADM. CODE § HSS 80.03(1)(b), which would have set child support for the two children at twenty-five percent of his adjusted base income, that was $557,385 in 1996. Accordingly, the trial court analyzed the relevant facts under the appropriate statutory framework of § 767.25(1m), STATS. The trial court also noted our admonition to use caution in strictly applying straight percentages in high-income cases. *See Hubert v. Hubert*, 159 Wis. 2d 803, 814, 465 N.W.2d 252, 256 (Ct. App. 1990).

The court first noted that if it had strictly followed the standards, the children's support would have been over $130,000 per year. Therefore, the court concluded that a strict application of the standards would be

unfair and unreasonable because such a high amount of child support would far exceed any amount necessary to provide for the children in a lifestyle similar to what the parties would have enjoyed had they not divorced. Furthermore, the court found that excessive amounts of child support would be detrimental to the children and the values that their parents had instilled in them. Finally, the court found that such a high award would constitute hidden maintenance to Lynne.

Therefore, the court set child support for the two children at just over $30,000 per year[1] based on twenty-five percent of John's income from 1995 which it found to be more representative of John's income both active and passive. The court determined that it would be inappropriate to use John's 1996 income because it was artificially inflated due to John's sale of stock and the end of his employment with AMI, factors the court had taken into consideration when it set maintenance and divided the marital property. Because the trial court correctly analyzed these facts under the proper statutory framework, we hold that it properly exercised its discretion by departing from the guidelines.

Lynne further challenges the circuit court's award of maintenance that is limited in term and less in amount than she believes is appropriate. The court concluded that Lynne had an earning capacity of $35,000 per year, experience in sales and an appropriate educational background in business that would allow her to become gainfully employed in the near future. In recognition of the need for some maintenance

[1] The trial court also made John responsible for maintaining the children's medical coverage and a life insurance policy guaranteeing the children's support.

until she was able to join the workforce at a level commensurate with her earning capacity, the court established maintenance for five years with the payments decreasing after the first year.

This court will not disturb the trial court's award of maintenance unless the award constitutes an erroneous exercise of discretion. *See Olski v. Olski,* 197 Wis. 2d 237, 243 n.2, 540 N.W.2d 412, 414 n.2 (1995). Trial courts have discretion in determining both the amount and duration of maintenance. *See LaRocque v. LaRocque,* 139 Wis. 2d 23, 27, 406 N.W.2d 736, 737 (1987). The starting point in determining maintenance is § 767.26, STATS. *See id.* at 32, 406 N.W.2d at 739–40. Section 767.26 sets forth a list of factors aimed at furthering the two objectives of maintenance: "the support objective," which is "to support the recipient spouse in accordance with the needs and earning capacities of the parties;" and "the fairness objective," which is "to ensure a fair and equitable financial arrangement between the parties in each individual case." *Id.* at 32–33, 406 N.W.2d at 740. In setting maintenance awards, a trial court must apply the § 767.26 factors to the facts of the case and must convert them into appropriate dollar amounts and time periods. *See id.* at 33, 406 N.W.2d at 740.

In this case, the circuit court awarded a total of $35,000 in maintenance to Lynne, to be paid over a period of five years, with the amount decreasing after the first year by $60.76 per month. In setting the maintenance amount, the court properly considered the factors enumerated in § 767.26, STATS., most notably that Lynne was relatively young, well educated with a good earning capacity, and that she should have been

able to re-enter the job market after a short adjustment period. In addition, the court noted that Lynne obtained a substantial property division and the marriage was of intermediate duration. Because the court considered the proper statutory factors and reached a reasoned conclusion, we conclude that the court properly exercised its discretion in setting maintenance. This amount satisfies the dual aims of support and fairness.

## C.  Property Division

Finally, Lynne argues that the trial court overvalued the gifted portion of shares John owned in AMI. John's relatives gifted him shares of the corporation over a period extending from 1976 through 1988. After attending graduate school in 1984, John began working for AMI. During the course of his employment, John worked in various supervisory capacities, eventually moving into administrative functions and assuming the presidency in 1992. John's employment with AMI ended in 1996 when he also sold his ownership interest for slightly over $2,000,000. The trial court concluded that just over $1,000,000 of the total sale value was gifted property and not subject to division as marital property. This conclusion Lynne claims is erroneous.

Property division rests within the sound discretion of the trial court. *See Friebel v. Friebel*, 181 Wis. 2d 285, 293, 510 N.W.2d 767, 770 (Ct. App. 1993). We also recognize that underlying discretionary decisions may be factual determinations that we do not upset unless they are clearly erroneous. *See Hollister v. Hollister*, 173 Wis. 2d 413, 416, 496 N.W.2d 642, 643 (Ct. App. 1992).

Although courts generally presume to divide all property equally, § 767.255(2)(a)1, STATS., provides that gifted property is not subject to division as a marital asset. Indeed, this court has held that even the appreciated value of a nonmarital gift maintains its nonmarital status where the appreciation is due to general economic conditions and where the nonowning spouse did not make contributions occasioning the appreciation. *See Plachta v. Plachta*, 118 Wis. 2d 329, 333–34, 348 N.W.2d 193, 195 (Ct. App. 1984). This court has also explained that while the appreciated value of nonmarital property may retain its nonmarital status, income generated by exempt stock must be included in the marital estate. *See Arneson v. Arneson*, 120 Wis. 2d 236, 244–45, 355 N.W.2d 16, 19 (Ct. App. 1984).

Here, the AMI shares were sold for slightly more than $2,000,000. The court determined that of that sum, the original gifted shares were to be excluded as nonmarital property, including the proportionate share of retained earnings and the increase in value attributable to general economic circumstances. The court further determined that a significant portion of the retained earnings of the corporation were undistributed dividends.[2] The portion of those "would-be

[2] In determining what portion of the AMI sales value was attributable to earned income and what portion was attributable to appreciated value due to general market conditions, the trial court concluded that:

a reasonable inference may be drawn that the earnings in this corporation were retained for the primary purpose to avoid taxation as a dividend and, thus, when subject to division of the corporation, as was done in this case, to be taxed at the lower capital gains rate, escaping the taxation as the corporation and

447

dividends" not actually gifted or attributable to general economic conditions was deemed marital property and subject to division.

Lynne appeals the court's determination as to what portion of the sales price was subject to division as marital property. Lynne specifically endorses the court's apportionment of retained earnings between marital and nonmarital property, but contends the trial court erred by not similarly apportioning the appreciated value of the shares.[3] Lynne contends that this increase in value was attributable to John's efforts at AMI.

The record, however, does not support Lynne's contention that the appreciated value was attributable to John's efforts as opposed to other factors. Indeed, the court specifically found that the appreciated value did result from the "the general accumulation efforts of previous generations and general market conditions." We must accept this finding of fact unless it is clearly erroneous. *See id.* John testified that only one new line of production was integrated during his tenure as president and CEO of AMI, but that that line was not profitable. John's testimony, and the reasonable inferences drawn therefrom, support the trial court's findings of fact. Lynne also presented no evidence

providing the stockholder a lower tax rate for capital gains. Based on the evidence which was presented in this case, this is what I find actually occurred. I find as fact that this was the primary purpose for the accumulation of the retained earning in this case. As such, the retained earning here have the characteristic of dividends which were not distributed.

[3] That amount being the difference between the value of the retained earnings and the sale price of the shares.

refuting the trial court's findings.[4] Therefore, we conclude that the trial court properly exercised its discretion by consistently and logically applying its methodology to divide the AMI stock between marital and nonmarital property.

*By the Court.*—Judgment affirmed.

---

[4] The trial court specifically sought any evidence that might refute the court's finding that some of the increased value of stock was attributable to general market conditions. To that question, Lynne's attorney responded, "[t]he way I would characterize it is what percentage of that is attributable to management, the president, specifically John, as opposed to the efforts of the other people. There is no evidence that will help you sort that out. There just isn't."