CLOVERDALE EQUIPMENT
COMPANY, a Michigan
corporation, Plaintiff,

v.

MANITOWOC ENGINEERING CO., A DIVISION OF the MANITOWOC COMPANY, INC., a Wisconsin corporation, Defendant.

Civil Action No. 96–40203.

United States District Court,
E.D. Michigan.

Jan. 13, 1997.

Christopher E. LeVasseur, Michael H. Whiting, Stark, Reagan & Finnerty, P.C., Troy, MI, for Cloverdale Equipment Co.

John E. Scott, Bruce R. Byrd, Dickinson, Wright, Moon, VanDusen & Freeman, Detroit, MI, Richard C. Ninneman, Daniel M. Janssen, Quarles & Brady, Milwaukee, WI, for Manitowoc Engineering Co.

***OPINION AND ORDER GRANTING DEFENDANT SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT AND DEFENDANT'S COUNTERCOMPLAINT***

GADOLA, District Judge.

Plaintiff, Cloverdale Equipment Company ("Cloverdale"), a Michigan corporation, filed

the instant action against defendant, Manitowoc Engineering, Company ("Manitowoc"), a Wisconsin corporation, on April 15, 1996, in state court. On May 10, 1996, the case was removed to this court pursuant to 28 U.S.C. § 1332; 1441.

In its complaint, Cloverdale alleges that Manitowoc violated the Michigan Farm and Utility Equipment Act ("MFUE Act"), M.C.L.A. 445.1451, et. seq., by purporting to terminate Cloverdale as a distributor of Manitowoc products without "good cause," notice and a ninety-day curative grace period, as provided for in the MFUE Act. Cloverdale seeks declaratory relief and damages. Cloverdale seeks a declaratory judgment that Manitowoc's purported termination violates the MFUE Act, together with damages as provided therein. Presently before this court is Manitowoc's motion for partial summary judgment on Cloverdale's claim for declaratory relief. For the ensuing reasons, Manitowoc's motion will be granted. This court also *sua sponte* grants summary judgment in favor of Manitowoc on both Cloverdale's claim for damages and Manitowoc's counterclaim.

## FACTS

Manitowoc is engaged in the business of designing, manufacturing and selling liftcranes and excavators. Liftcranes are lattice-boom cranes with lifting capacities ranging from 100 to 1500 tons. Such cranes are used primarily in the heavy construction industry to drive pile, place forms, pour concrete, set steel and erect heavy components.[1] Liftcranes, however, are also used by the marine industry to handle bulk cargo and to load and unload containers of ships. Excavators, primarily utilized in mining, dredging, and excavating industries, are lattice-boom cranes equipped with draglines and clamshells, with bucket capacities ranging from 20,000 to 80,000 pounds.[2] With one exception, Manitowoc products are crawler cranes (e.g. cranes mounted on tracks similar to those found on bulldozers and military tanks).

Cloverdale is engaged in the trade of selling, renting and servicing cranes and related excavation attachments. On June 12, 1989, Manitowoc and Cloverdale entered into a "Distributorship Agreement" ("Agreement"), whereby Manitowoc appointed Cloverdale to be a non-exclusive[3] distributor to sell and service Manitowoc's cranes and excavators in the state of Michigan for one year. On June 12, and each year thereafter, a new one-year Agreement was signed.

The last Agreement entered into between Cloverdale and Manitowoc covered the period June 12, 1994 through 1995, and provided in pertinent part:

13. Duration and Termination of Agreement.

(a) The effective date of this Agreement is the date first above written [June 12, 1994]. Except as provided in subparagraph 13(b) below, the Agreement shall remain in effect until June 12th, 1995, subject to the right of either party to terminate it by a ninety (90) day written notice to the other, but such termination notice shall not be given prior to July 12th, 1994.

After the expiration of the aforementioned Distributorship Agreement, the parties apparently maintained their business relationship. Then, on October 24, 1995, Manitowoc notified Cloverdale, in writing, of the termi-

---

1. For instance, one liftcrane model, the "Manitowoc 4100W Series 2–retrofit package," is equipped with a 180–foot boom capable of swinging a 65–ton precast concrete segment into place. This crane was used in the construction of a stadium in downtown Minneapolis, Minnesota.

2. The "Manitowoc 4600 Series 1" is an excavator model, rigged with a 40–foot boom and 7–cubic yard bucket. This excavator was employed in the excavation of rocks in a single-seam bituminous deposit at an open pit strip mine in West Virginia.

3. In the Agreement, Manitowoc reserved the right "to appoint other distributors in [Michigan] and to make direct sales to customers in such area or elsewhere, free of any obligation for payment of discounts or other form of compensation to the Distributor, or to any other distributor appointed by Manitowoc." Likewise, Cloverdale acted as a distributor for other companies, such as Ingersoll–Rand, National Crane, Lull Corporation, Tadana and Koehring.

nation of the distributorship relationship to take effect 90 days after receipt of the same. The notice did not specify *any* grounds for termination.

On June 20, 1995, after the expiration of the 1994–95 Agreement and prior to the date that Manitowoc sent Cloverdale a termination notice, the Michigan Legislature adopted the following amendment to the MFUE Act:

A supplier shall not terminate, cancel, fail to renew, or substantially change the competitive circumstances of an agreement without *good cause.* A supplier shall provide a dealer at least 90 days prior written notice of termination, cancellation, nonrenewal, or substantial change in competitive circumstances. *The notice shall state the reasons for the action, and the dealer has 90 days to submit a plan to correct the stated deficiencies.*

M.C.L.A. § 445.1457a. While Manitowoc concedes that it did not comply with the cessation criteria set out at the MFUE Act, it contends that MFUE is inapplicable to the case at hand. If applicable, Manitowoc argues that the MFUE is unconstitutional because it flagrantly violates the Contracts Clauses of both the United States and Michigan Constitutions.

### *DISQUALIFICATION IS NOT WARRANTED*

■ As a preliminary matter, it should be noted that the law firm of Dickinson, Wright, Moon, VanDusen and Freeman ("Dickinson, Wright") is co-counsel for Manitowoc. Michael Gadola, son of the undersigned, to whom this case has been assigned, is a junior associate in that firm. This court has given deliberation to whether recusal is warranted based upon his son's affiliation with Dickinson, Wright, yet concluded that neither Title 28 U.S.C. § 455(a) or (b)(5)(iii) require recusal.

First, Title 28 U.S.C. § 455(b)(5)(iii) mandates disqualification when a person within the third degree of relationship to the judge "[i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." Courts have consistently held that a judge's kin does not have an "interest that could be substantially affected" when he or she is only an associate, as opposed to a partner, in a law firm representing a party to the action and does not actively participate in the proceeding, The seminal case on this issue is *U.S. ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456 (5th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782, *reh'g. denied,* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978), where the court held that 28 U.S.C. § 455(b)(5)(iii) did not require disqualification of district judge whose son was only an associate in the law firm representing the defendant and did not actively participate in the proceeding,

Second, Title 28 U.S.C. § 455(a), the "catch-all" disqualification provision that applies whether or not 28 U.S.C. § 455(b)(5)(iii) is applicable, does not command recusal under the circumstances. This provision directs a judge to recuse himself when his "impartiality might reasonably be questioned." This court has determined that the instant case can be decided in a fair and unbiased manner, and that reasonable persons would not question the judge's impartiality. *See Equifax,* 557 F.2d 456 (holding that disqualification was not required under 28 U.S.C. § 455(a) because the judge's son was only an associate in a firm representing the defendant and under these circumstances, a reasonable man would not conclude that judge's impartiality might reasonably be questioned). *See also Hamid v. Price Waterhouse,* 51 F.3d 1411, 1415–17 (9th Cir.1995) (recusal of the district court judge not required even though one of the judge's clerks, during an early stage of the case, subsequently became an associate of the firm that represented a party in the case, since law clerk did not work on that case); *Holmberg v. Morrisette,* 800 F.2d 205, 209 (8th Cir.1986) (court stated that district court appeared to have complied with recusal statute notwithstanding the trial judge's refusal to recuse himself from determining attorney fees because his son was an associate in the law firm representing one of the parties); *Wilmington Towing Company, Inc. v. Cape Fear Towing Company, Inc.,* 624 F.Supp. 1210 (E.D.N.C.1986), *cert. denied,* 481 U.S.

1028, 107 S.Ct. 1953, 95 L.Ed.2d 526 (1987) (recusal not required when judge's son had worked as a summer associate and tentatively accepted employment with the law firm representing plaintiff); *Diversifoods, Inc. v. Diversifoods, Inc.*, 595 F.Supp. 133 (N.D.Ill. 1984) (recusal not required when judge's husband worked for firm representing defendant, but did not act as a lawyer in the pending case). And, in any event, at oral argument on October 30, 1996, the affiliation of Michael Gadola with Dickinson, Wright was fully disclosed, but both parties agreed and consented to the court's continued participation and also this court advised that if there were any questions relating thereto, the court was entirely willing to recuse himself. *See* Title 28 U.S.C. § 455(e) ("Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification").

## II. ANALYSIS

### A. Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### B. Whether the MFUE Act is Applicable

The threshold issue that confronts this court is the applicability of the MFUE Act to the case at hand. If this court determines that the MFUE Act is inapplicable, then it need not decide whether the Act is retroactive and unconstitutional in application.

### 1. Whether Liftcranes and Excavators are "Equipment" Under the MFUE Act

Manitowoc contends that the MPUE Act is inapplicable to the case at hand because Manitowoc's products do not fall within

the purview of the MFUE Act. Under the MFUE Act, "[e]quipment means motorized machines designed for or adapted and used for agriculture, horticulture, livestock raising, forestry, grounds maintenance, lawn and garden, construction, materials handling, and earth moving." M.C.L.A. § 445.1452(d).

Specifically, Manitowoc contends that the Michigan Legislature passed the MFUE Act to protect dealers of lighter-weight and lower-priced equipment, such as lawn mowers and chain saws, and not heavier-weight and more expensive equipment, such as Manitowoc's 1,500 ton liftcranes and 80,000 pound excavators.[4] Manitowoc claims that although the Act encompasses "construction, materials handling and earth moving equipment," the MFUE Act does not cover *all* such equipment. Rather, the statute is limited to construction, materials handling and earth moving equipment utilized for farming and related uses.

Manitowoc interprets the statute this way by using the statutory construction canon of *ejusdem generis*. This doctrine provides that "if a law contains general words following an enumeration of particular subjects, those general words are presumed to include only things of the same kind, class, character, or nature as the subjects enumerated." *Suttles v. Dept. of Transp.*, 216 Mich. App. 166, 548 N.W.2d 671 (Mich.App.1996). In particular, Manitowoc finds the words "construction, materials handling and earth moving equipment" to be broad general words, which require further clarification. Manitowoc maintains that clarification of these words can be achieved by examining other more specific types of equipment enumerated in the MFUE Act, notably: agriculture, horticulture, livestock raising, forestry, grounds maintenance, lawn and garden equipment. When construction, materials handling and earth-moving equipment is placed alongside agriculture, horticulture and other farm-related equipment, Manitowoc deems the statute's limited scope to be readily apparent as not including 1,500 ton liftcranes and 80,000 pound equipment.

Basically, in response, Cloverdale insists that the statutory language is unambiguous and clear as encompassing Manitowoc's products. According to Cloverdale, Manitowoc's liftcranes and excavators, used for dredging, unloading cargo and driving pile, can be classified as "construction, materials handling and earth moving" equipment under the MFUE Act.

It is well-settled in Michigan that when construing statutes, courts must ascertain and give effect to the Legislature's intent. *City of Livonia v. Dept. of Social Services*, 423 Mich. 466, 487, 378 N.W.2d 402 (1985); *Pioneer State Mutual Ins. Co. v. Allstate Ins. Co.*, 417 Mich. 590, 595, 339 N.W.2d 470 (1983). "If the language of the statute is clear and unambiguous, the intent must be determined accordingly and no judicial interpretation is warranted." *City of Livonia*, 423 Mich. at 487, 378 N.W.2d 402. *See also Gardner–White Co. v. State Bd. of Tax Administration*, 296 Mich. 225, 295 N.W. 624 (1941) (holding that where the statute is plain and ambiguous in its terms, the courts have nothing to do but to obey it.); *Fuller v. Textron, Inc.*, 170 Mich.App. 68, 71, 427 N.W.2d 590 (Mich.App.1988), *lv. app. denied*, 432 Mich. 933 (1989) ("When the language of the statute is clear, it is assumed that the Legislature intended the meaning it has plainly expressed."). In interpreting statutory language, words should be given their commonly accepted meaning. *Production Credit Ass'n of Lansing v. Dep't. of Treasury*, 404 Mich. 301, 312, 273 N.W.2d 10 (1978), *rev'g* 68 Mich.App. 409, 242 N.W.2d 794 (1976).

In this case, legislative intent can be gleaned from the clear language of the statute, so this court will enforce the statute as written. The words, "construction, materials handling, and earth moving equipment" are plain and unambiguous, and not reasonably susceptible to varying interpretations. The statute contains no weight restriction, which would limit

---

**4.** *See Fuller v. Textron, Inc.*, 170 Mich.App. 68, 71, 427 N.W.2d 590 (Mich.App.1988), *lv. app. denied*, 432 Mich. 933 (1989) (holding that a seller of "lawn mowers, lawn tractors, garden tractors, snow throwers, chain saws and string trimmers" was "clearly" entitled to protection under the MFUE Act).

the reach of the statute to smaller equipment. As Manitowoc's products are machines used for earth moving and construction purposes, they undoubtedly fit into the broad categories of "construction, materials handling and earth moving equipment." In particular, liftcranes are used for earth moving and materials handling purposes to drive pile, place forms, pour concrete, set steel, and erect heavy components, as well as handle bulk cargo and to *load* and unload containers of ships. Excavators, likewise can be classified as earth moving equipment, for they are employed by the mining, dredging and excavating industries to move land.

### 2. Whether Cloverdale is a "Dealer" Under the MFUE Act

■ A related argument Manitowoc proffers is that Cloverdale is not a "dealer," as that term is defined in the MFUE Act, and thus the MFUE Act does not govern the parties' relationship. According to the MFUE Act, "[d]ealer means a person engaged in the business of retail sale of farm tractors and equipment, utility tractors and equipment, or the attachments to or repair parts for that equipment. Dealer includes retail dealers, wholesalers, and distributors *that obtain inventory from another person for resale.*" M.C.L.A. § 445.1452(c) (emphasis added).

Specifically, Manitowoc does not consider Cloverdale a "dealer," as that term is defined in the MFUE Act since Manitowoc asserts that Cloverdale does not maintain an inventory of Manitowoc's products. Manitowoc points out that Cloverdale does not sell out of an inventory, but rather solicits orders which are sent to Manitowoc for manufacture and shipment directly to the customer. Then, seizing on the language "that obtain inventory from another person for resale," Manitowoc argues that in order to qualify as a "dealer" under the MFUE Act, Cloverdale must maintain an inventory. Manitowoc recognizes that Cloverdale does retain one liftcrane on its premises, but argues that this crane is not "inventory"; this crane has been present on Cloverdale's property since January 21, 1991 and is regularly rented by Cloverdale to its customers.

Cloverdale does keep an inventory of parts, but Manitowoc argues that a business does not qualify as a "dealer" under the MFUE Act if it only maintains an inventory of parts, but not wholegoods. Manitowoc contends that the definition of inventory (e.g. "farm tractors, utility tractors, equipment and accessories for attachments to and repair parts for *those tractors and that equipment,*" M.C.L.A. § 445.1452(c)) indicates that the inventory of parts held by the dealer must complement the tractors and equipment the dealer is also required to keep in inventory.

Moreover, Manitowoc relies on legislative history. Manitowoc advocates that when the Michigan Legislature amended the definition of equipment in 1989 from including only "agriculture, horticulture, livestock raising, forestry and grounds maintenance" machines to embracing "lawn and garden, construction, materials handling and earth moving equipment," it did so to protect a broader range of "farm equipment dealers," but not to safeguard dealers of very large liftcranes and excavators, such as Cloverdale. For instance, Manitowoc refers this court to a Michigan House of Representatives bulletin discussing the 1989 Amendments to the MFUE Act. The bulletin provides, in relevant part:

> The Farm and Utility Equipment Franchise Act was enacted in 1984 *to protect farm and utility equipment dealers* from losses incurred when a supplier terminates a contract, leaving the dealer with surplus inventories which the supplier refuses to repurchase. These dealers often are required by their suppliers to maintain certain parts and machinery inventories—in some cases, worth over $1 million—in order to meet emergency demands *for equipment from farmers and others who use this type of machinery,* who due to equipment failure, may need to get parts or equipment quickly to ensure their operations are uninterrupted. The act requires an equipment supplier to repurchase surplus inventories if a contract between a supplier and dealer terminates. After a recent court ruling declared that a certain dealer was not a "franchise," as the act defines that word, which exempted the supplier in the case from having to comply

with the requirements in the act, the proponents of the original legislation see the need to amend the act and its title to ensure that the act includes a broader range of dealers, wholesalers and distributors of various types of farm and utility equipment who, they assert should be covered under the act. Also, since the act's creation, it has been evident that some larger suppliers, when under contract with small dealers, have been able to easily absorb the financial penalty for failing to repurchase certain inventory upon a contract termination when they find it to their advantage to ignore the requirements. House Analysis Section, H.B. 4112.[5] Citing to this bulletin, Manitowoc insists that the Michigan Legislature never meant to protect dealers who sell very large cranes and excavators and thus, urges this court to limit the scope of the MFUE Act to farm equipment so as to carry out the intent of the Michigan Legislature.

Cloverdale argues that the plain language of the MFUE Act does not require a person to maintain inventory in order to qualify as a dealer. And, even if a pre-requisite to protection under the MFUE Act is maintenance of an inventory, then Cloverdale contends that it nonetheless qualifies as a dealer because it currently carries one model M80W crane. In the affidavit of Thomas A. Moilanen, President of Cloverdale, he avers that "[t]hough it is not practical to maintain a significant inventory of Manitowoc cranes and excavators due to their size and cost, Cloverdale does currently maintain a Model M80W crane in its inventory and available for sale to potential Manitowoc/Cloverdale customers."

In the event this court does not account for the Manitowoc M80W crane as in "inventory," Cloverdale asserts that Manitowoc's position is further defeated by its failure to address the significance of Cloverdale's substantial inventory of repair parts. Cloverdale believes that maintaining an inventory of repair parts, alone, entitles it to protection under the MFUE Act, which defines dealers as persons engaged in the sale of "attachments to or repair parts for" utility tractors and equipment. M.C.L.A. § 445.1452(c). Furthermore, Cloverdale argues that although the legislative history issued contemporaneous with passage of amendments to the MFUE Act, which was cited by Manitowoc, evinces a clear intent to protect farm equipment dealers, there is no evidence that the Legislature intended to exclude dealers such as Cloverdale, from the MFUE Act's reach.

Once again, this court resorts to principles of statutory construction to determine if Cloverdale is a "dealer," as that term is used in the MFUE Act. First, this court interprets the word "dealer" as containing an inventory requirement. The statute expressly provides that a "dealer" includes "retail dealers, wholesalers and distributors *that obtain inventory from another person for resale.*"[6] M.C.L.A. § 445.1452(c). Having

---

**5.** Manitowoc also cites House Legislative Analysis Section, H.B. 4352, which provides, in pertinent part, "[t]he Farm and Utility Equipment Franchise Act was enacted in 1984 to protect farm and utility equipment dealers from losses incurred when a supplier terminates a contract, leaving the dealer with surplus inventories which the supplier refuses to repurchase."

**6.** It should be noted that this court finds the word "includes" in the sentence, "Dealer includes retail dealers, wholesalers, and distributors that obtain inventory from another person for resale," M.C.L.A. § 445.1452(c), as indicating that the terms "retail dealers, wholesalers and distributors" do not comprise an exclusive list. There may be other franchises not termed, "retailers, wholesalers and distributors" that are covered by the Act.

Yet, even if the word "includes" modified the phrase "that obtain inventory from another person for resale," instead of modifying the words "retail dealers, wholesalers and distributors," this court finds that the word "includes" is a word of limitation, not enlargement. "When used in a statute, the word 'include' may be construed as a word of enlargement or limitation and is not in and of itself determinative of how it is intended to be used." *Nelson v. Kendrick*, 187 Mich.App. 367, 370, 466 N.W.2d 402 (Mich.App. 1991) (citation omitted). In other words, this court finds that the word "includes" indicates that in order to qualify as a dealer, one must obtain inventory from another for resale. A review of the entire MFUE Act leads this court to believe that the word "include" is a word of limitation. The MFUE Act is essentially an inventory repurchase statute, making it essential that a person retain inventory in order to be amenable to the statute's protection.

found that a person must obtain inventory to be protected by the MFUE Act, this court must decide what constitutes "inventory." "Inventory" is defined as "farm tractors, utility tractors, *equipment,* and accessories for attachments to and repair parts for those tractors and that equipment." M.C.L.A. § 445.1452(f). Previously, it was determined that Manitowoc's liftcranes constitute "equipment" under the Act, ergo, the lonely Manitowoc liftcrane that Cloverdale has retained on its premises for the past five years for sale or lease constitutes "inventory," entitling Cloverdale to the MFUE Act's shelter. And, assuming arguendo, that the liftcrane was not "inventory," Cloverdale would still qualify as a dealer under the MFUE Act because it carries a significant parts inventory. The maintenance of the parts inventory, alone, confers Cloverdale with dealer status under the MFUE Act. To reiterate, the statute defines a dealer as "a person engaged in the business of the retail sale of farm tractors and equipment, utility tractors and equipment, or the attachments to *or the repair parts for that equipment.*" M.C.L.A. § 445.1452(c). The unambiguous interpretation of this definition is that a person can retain an inventory of repair parts only, and still qualify for dealer protection, so long as the repair parts are for "equipment," as that term is defined in the MFUE Act.

## C. *Whether Retroactive Application of the MFUE Act Violates the Michigan and United States Contracts Clauses*

The next issue is whether application of the MFUE Act to the case at hand is constitutional. Actually, ascertaining the constitutionality of the MFUE Act in this case involves a two-step inquiry. First, this court must determine if the statute is being applied retroactively. Second, if the statute is being applied retroactively, this court must decide if such retroactive application offends the Contracts Clause of both the United States and Michigan Constitutions.

### 1. *Whether the MFUE Act Applies Retroactively*

The first inquiry is whether the statute applies retroactively. In other words, the issue is whether the parties entered their final agreement after June 20, 1995, the effective date of the "just cause" provision in the MFUE Act. M.C.L.A. § 445.1457a. There is no constitutional retroactivity issue if the parties entered the final contract subsequent to the effective date of the MFUE Act's termination provision.

Recall that the last written Agreement signed by the parties expired on June 12, 1995. Thereafter, Cloverdale and Manitowoc conducted business until Manitowoc sent notification of termination on October 24, 1995. The question thus is: what kind of contract governed the parties' relations from June through October, 1995, and what date was that contract entered into?

Both parties agree that the contract which governed the parties' relationship was an implied in fact contract. However, Cloverdale and Manitowoc disagree on the date the implied in fact contract commenced. Cloverdale urges this court to find that upon expiration of the Agreement on June 12, 1995, the parties entered into a day-to-day contractual arrangement, which automatically renewed itself each day, so long as Manitowoc chose to continue recognizing Cloverdale as a Michigan dealer.[7] In contrast, Manitowoc insists that the parties entered into a one-year implied contract on June 12, 1995, on the same terms as the terms expressed in the previously executed written Agreements.

As previously stated, Cloverdale contends that a day-to-day arrangement existed after the Agreement expired. Cloverdale argues that an implied in fact daily contractual arrangement was contemplated in *Northshore Cycles, Inc. v. Yamaha Motor Corp. U.S.A.,* 919 F.2d 1041 (5th Cir.1990). However, Cloverdale is incorrect in its reading of *Northshore.*

In *Northshore,* the Fifth Circuit was confronted with a Contracts Clause challenge to

---

7. Cloverdale also argues that when the Agreement expired on June 12, 1995, Manitowoc was no longer under a contractual duty to comply with the termination provisions of the Agreement, which required that Manitowoc furnish Cloverdale with 90–days advance notification of termination.

a Louisiana statute that required motorcycle manufacturers to re-purchase inventory upon termination of a dealer.[8] The manufacturer in *Northshore*, argued that the statute violated the Contracts Clause by impairing the manufacturer's rights under a "Dealer Agreement" the parties had entered into prior to the statute's effective date, which gave the manufacturer the option, but did not mandate that the manufacturer re-purchase the dealer's products.

The court held that the "substantive provision of the Statute, requiring the manufacturer to repurchase inventory from the dealer" violated the Contracts Clauses since the Dealer Agreement pre-dated the effective date of the statute. Yet, in dicta, the court noted that not every contract entered into prior to the effective date of the statute was immune from the inventory re-purchase provisions:

> For example, a contract for a specified term such as one year to three years, which provides for automatic renewal from year to year or month to month unless one party notifies the other declining renewal, would likely not be constitutionally exempt from the Statute's inventory repurchase provisions if following the effective date of the Statute the then current term of the contract had expired and been automatically renewed. Similarly an open ended dealer agreement which empowers either party to terminate *without cause* merely by furnishing, say, thirty (30) days' notice to the other party, might be construed as a *month-to-month arrangement* which *automatically reconducts itself each month* until such notice is furnished by one of the parties. Such an arrangement, too, might be held ineligible for the constitutional shield against the inventory repurchase obligation of the statute because, conceptual-

ly, the agreement could be deemed to confect a new contract each month.

*Id.* at 1043. (emphasis added). Basically, the *Northshore* court found that it would not be unconstitutional to apply the statute to contracts which contained automatic renewal provisions, and which renewed on their own accord prior to the effective date of the statute. The court also suggested that it would not be unconstitutional to apply the statute to open-ended contracts containing a 30 day notice of termination provision, because by operation of the 30 day notice of termination provision, these contracts were in essence month-to-month arrangements and the statute could be regarded as having taken effect the month prior to the date that the contract took effect. By analogy, then, the *Northshore* court would probably not find it unconstitutional to apply the statute to open-ended contracts containing *no* notice of termination provision, since these contracts are basically, in the eyes of the *Northshore* court, day-to-day arrangements, and the statute could be deemed to have come into existence the day prior to the day the contract was formed. That said, it is readily apparent to this court that *Northshore* provides no guidance to the case at hand, since this case does not involve a contract containing an express automatic renewal provision that renewed the Agreement after the effective date of the MFUE Act, nor does this case involve an open-ended contract.

 Michigan law regarding implied in fact contracts does provide meaningful aid in determining what type of contract was formed on June 12, 1995. Under Michigan law, "[a] contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding, of men, show a mutual intention to contract." *Erickson v. Goodell Oil Co., Inc.,* 384 Mich. 207, 211–12, 180 N.W.2d 798 (1970); *In re Munro's Estate,* 296 Mich. 80,

---

**8.** The Louisiana statute at issue reads, in relevant part:

> In the event the dealer ceases to engage in the business of being a motorcycle dealer or ceases to sell a particular make of motorcycle and after notice thereof to the manufacturer by registered or certified mail, return receipt requested within thirty days thereafter, the man-

ufacturer shall repurchase all new and used motorcycles of the current or immediate prior model year and parts on hand that have not been damaged or substantially altered to the prejudice of the manufacturer while in the possession of the dealer. All required demonstrators shall be repurchased by the manufacturer. La.Rev.Stat. Ann. § 32:773.2.

295 N.W. 567 (1941).[9] As a general rule, an implied agreement arises when a written contract expires by its terms and the parties continue to perform as before. *Comenos v. Viacom Intern., Inc.*, 857 F.Supp. 1160, 1165 (E.D.Mich.1994).[10] Therefore, in the case at hand, because the parties had established a formal course of dealing as evidenced by written Agreements dating from June, 1989 through June, 1994, which were *always* for a one-year term, it can be said that parties continued "business as usual" after the 1994–1995 written Agreement expired. Thus, this court finds that on June 12, 1995, prior to the effective date of the MFUE amendment, an implied in fact agreement was created, which incorporated the same material terms (e.g. one-year duration; 90–days notice prior to termination) as the most recently expired Agreement. Thus, this court is confronted with a retroactivity issue.

## 2. Whether Retroactive Application of the MFUE Act Violates the Michigan and U.S. Constitution

██ Having found that the parties' agreement commenced prior to the effective date of the MFUE Act, as amended, this court must now confront the issue of whether retroactive application of the MFUE Act, as compelled by Section 445.1460 of the Michigan Compiled Laws Annotated, is unconstitutional.[11] Manitowoc argues that such retroactive application substantially impairs the parties' existing contractual obligations, and thus offends the Contracts Clauses of the Constitutions of the United States[12] and the State of Michigan.

9. "A contract is implied where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the' conduct of the parties language used, or things done by them, or other pertinent circumstances attending the transaction." *Miller v. Stevens*, 224 Mich. 626, 632, 195 N.W. 481 (1923).

10. The court applied New York law, but held that New York and Michigan law were identical with respect to the issue of whether "a new contract was implicitly created by the parties, having continued an employment relationship under the same terms as the previous year's contract." *Comenos*, 857 F.Supp. at 1164.

In *Blue Cross & Blue Shield of Michigan v. Governor*, 422 Mich. 1, 21–23, 367 N.W.2d 1 (1985), the Michigan Supreme Court adopted the United States Supreme Court's three-pronged "balancing approach" for deciding challenges to both the Michigan and United States Contracts Clauses:

The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past... If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such *as* remedying of a broad and general social or economic problem. Furthermore, since *Blaisdell*,[13] the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation ... Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption."

*Id.* at 21–22, 367 N.W.2d 1 (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (1983)) (citations omitted).

11. Section 445.1460 of the Michigan Compiled Laws Annotated, provides that "[t]he provisions of this act shall apply to all agreements, contracts, sales agreements, security agreements, or franchise agreements written or implied in force and effect on or after January 2, 1990."

12. Article I, Section 10, Clause 1 of the United States Constitution prohibits the states from passing "any law impairing the obligation of contracts." Article I, Section 10 of the Michigan Constitution also proscribes legislation impairing the obligation of contracts.

13. *Home Building & Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

## a. Whether the MFUE Act Has Operated a Substantial *Impairment of a Contractual Relationship*

The first inquiry under the balancing test is whether M.C.L.A. § 445.1457a substantially impairs the contractual relationship. A critical factor to be considered in determining the extent of the impairment is whether the complaining party has been regulated in the past. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978), *reh'g. denied*, 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201 (1978).

In support of its position that the parties' contract has been substantially impaired by the MFUE Act, Manitowoc contends that this case is analogous to *Rolec, Inc. v. Finlay Hydrascreen U.S.A., Inc.* 917 F.Supp. 67 (D.Me.1996), where a substantial impairment of a contract was found. In *Rolec*, the plaintiff and defendant entered into an agreement in 1986, granting plaintiff the right to be defendant's exclusive equipment distributor in three Northeastern states. In February, 1993, the agreement was renewed and in July, 1993, the agreement was terminated. The agreement allowed either party to terminate the relationship upon 90 days notice.

In October, 1993, three-months after the parties terminated their relationship, the Maine Legislature enacted the Franchise Laws for Power Equipment, Machinery and Appliances (the "Maine Act"), which prohibited termination absent good cause, prior written notice and an opportunity for cure. The court found substantial impairment in that the statute imposed a "significant change to the economic relationship" and thus refused to retroactively apply the statute. *Id.* at 69.[14] The manufacturer found itself "in a virtually permanent relationship from which it [could] not extricate itself without surmounting significant hurdles, contrary to the economic relationship the parties had established voluntarily before the court." *Id.* The court also found that the extent of the impairment was compounded by the fact that prior to passage of the Maine Act, the parties were never before regulated. *Id.* The same is true here—Manitowoc found itself bound by legislative good cause and curative requirements that locked it into an existing distributorship arrangement. Also, like *Rolec*, in which the industry had never been regulated, the industry in this case was subject to virtually no regulation. Prior to passage of the 1995 MFUE Act provision at issue in this case, M.C.L.A. § 445.1457a, the only regulations imposed upon the parties were the 1989 MFUE Act provisions concerning inventory repurchase standards.[15] This case is unlike cases where the courts found an industry subject to substantial regulation including, for example, the gas industry, *Energy Reserves*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the insurance industry, *Blue Cross & Blue Shield*, 422 Mich. 1, 367 N.W.2d 1 (1985), and the building and loan business, *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark, N.J.*, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940). The fact that other varieties of Michigan franchise relationships are heavily regulated and subject to continual legislation (e.g. beer and wine distributors), does not put the heavy-equipment franchise industry on notice that *it* is subject to further legislation. *Holiday Inns Franchising Inc. v. Branstad*, 29 F.3d 383 (8th Cir.1994), *aff'd. McDonald's Corp. v. Nelson*, 822 F.Supp. 597 (S.D.Iowa

14. In *Rolec*, the Maine Act did not provide for retroactive application, whereas in the instant case, Section 445.1460 of the MFUE Act definitely provides for retroactive application. Other cases defendant cites, in which good cause provisions were found to substantially impair pre-existing contracts, did not contain retroactivity provisions. *See Gulfside Distributors, Inc. v. Becco, Ltd.*, 985 F.2d 513 (11th Cir.1993); *Scuncio Motors, Inc. v. Subaru of New Eng.*, 555 F.Supp. 1121, 1130 (D.R.I.1982), *aff'd.*, 715 F.2d 10 (1983); *H. Phillips Co., Inc. v. Brown–Forman Distillers Corp.*, 483 F.Supp. 1289 (W.D.Wis. 1980); *Jacobsen v. Anheuser–Busch, Inc.*, 392

N.W.2d 868 (Minn.1986), *cert. denied* 479 U.S. 1060, 107 S.Ct. 941, 93 L.Ed.2d 991 (1987); *Fireside Chrysler–Plymouth Mazda, Inc. v. Chrysler*, 129 Ill.App.3d 575, 84 Ill.Dec. 724, 472 N.E.2d 861 (1984); and, *Globe Liquor Co. v. Four Roses Distillers Co.*, 281 A.2d 19 (Del.1971), *cert.* denied, 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971).

15. The statute's inventory repurchase requirements were not an imposition on Manitowoc, however, because the Agreement provided for the same.

1993), *cert. denied,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994).

Cloverdale cites to the case of *Anderson's Vehicle Sales, Inc. v. O.M.C.–Lincoln,* 93 Mich.App. 404, 410, 287 N.W.2d 247 (1979), where the court found no substantial impairment to retroactive application of a Michigan statute requiring notice in writing and reasonable cause prior to termination of a motor vehicle dealer, in part, because the statute embodied an archaic concept of "good-faith" in slightly modified language. In other words, the court found that the manufacturer was under a common law duty to terminate the dealer in "good faith"—"where the relationship is commercial and does not involve fancy, taste, sensibility, judgment or other personal features, the option [of a party to terminate a contract] may be exercised only in good faith" [16]—and thus did not find that the statute burdened it with a new contractual duty. Yet, *Anderson's* is questionable precedent because it is "contrary to the Michigan Supreme Court's subsequent opinion" of *In re Certified Questions,* 416 Mich. 558, 331 N.W.2d 456 (1982), which sets forth the modern standard for evaluating Contracts Clause issues as promulgated by the United States Supreme Court in *Energy Reserves,* 459 U.S. at 413, 103 S.Ct. at 705–06 (1983). *Dale Baker Oldsmobile v. Fiat Motors of North America,* 1984 WL 14133 (W.D.Mich.1984), *aff'd,* 794 F.2d 213, 218 (6th Cir.1986). In fact, the Sixth Circuit is "convinced that the highest state court [in Michigan] would decide differently" if confronted with the same case today. *Id.* Accordingly, this court declines to follow *Anderson's,* 93 Mich.App. 404, 287 N.W.2d 247.

This court is mindful that the Legislature's decision to apply the MFUE Act retroactively is entitled to significant deference. *Energy Reserves Group,* 459 U.S. at 413, 103 S.Ct. at 705–06 (1983). In this case, the Legislature chose to give the MFUE Act retroactive effect in order to "assure that these provisions are extended to contracts currently in effect." [The legislature believed, "[t]o do so otherwise would leave open the possibility that current contracts could be terminated to avoid the provisions of the bill.]" *House Leg.*

*Analysis Section,* H.B. 4412. This court finds that Legislature could have accomplished such a purpose by making less of an intrusion on contracts, e.g. by giving parties subject to the new statute a grace period. *See Rolec,* 917 F.Supp. 67, 69 (D.Me.1996) (finding that the "Legislature could easily have fulfilled all its objectives by applying this new law to new franchise agreements in this previously unregulated area, but allowing a grace period—for example, six months—for existing franchise agreements to be terminated, failing which they would be subject to the new law"). For all these reasons, this court finds that retroactive application of M.C.L.A. § 445.1457a substantially impairs existing contractual relations.

### b. *Whether There is a Significant and Legitimate Public Purpose Behind the Regulation*

Since the impairment has been found to be severe in this case, the next inquiry is whether there is a significant and legitimate public purpose behind the legislation. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). The Supreme Court has held that remedying a broad and general social or economic problem satisfies this requirement, while a statute with a very narrow focus does not satisfy this requirement. *Id.*

Manitowoc argues that there is no legitimate public purpose because the termination provision does not remedy a broad and general social purpose. Cloverdale argues that the legitimate public purpose is the balancing of the inequities inherent in the relationships between manufacturers and dealers.

The Michigan Legislature set out the purposes of the MFUE Act in the Preamble, which are:

to provide for the compensation for or repurchase of *certain* farm tractors, attachments, equipment, utility tractors and equipment by *certain* manufacturers or suppliers subject to certain dealer, wholesaler, or distributor agreements; to pro-

---

**16.** *Anderson's,* 93 Mich.App. at 410, 287 N.W.2d 247.

vide for the repurchase of *certain* repair parts; to impose certain duties and responsibilities on *certain* persons; and to provide certain remedies.

(emphasis added). Manitowoc is correct in its assertion that the MFUE Act does not serve a broad general purpose. The Preamble refers repeatedly to assisting "certain" people, not society as a whole. *Malcolm v. City of East Detroit*, 437 Mich. 132, 143, 468 N.W.2d 479 (1991), *rev'g.*, 180 Mich.App. 633, 447 N.W.2d 860 (1989) ("Although a preamble is not to be considered authority for construing an act, it is useful for interpreting its purpose and scope.").

### c. Whether the Means Adopted to Implement the Legislation are *Reasonably Related to the Public Purpose*

"Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Reserves*, 459 U.S. 400, 412, 103 S.Ct. 697, 705, 74 L.Ed.2d 569 (1983). Since this court has found no significant and legitimate public purpose, there is no need to decide if the MFUE Act's just cause provision is reasonably related to the legislature's purpose.

In sum, this court finds that retroactive application of Section 445.1457a of the MFUE Act violates the Contracts Clauses of the Constitutions of both the United States and the State of Michigan. Thus, this statute does not apply to the relationship between Cloverdale and Manitowoc. Manitowoc's motion for partial summary judgment with respect to Cloverdale's claim for declaratory relief must be granted. Also, because application of the MFUE Act to this case is unconstitutional, this court *sue sponte* grants summary judgment in favor of Manitowoc on Cloverdale's claim for damages under the MFUE Act.

Furthermore, this court *sua sponte* grants summary judgment in favor of Manitowoc on its counterclaim, which alleges that the MFUE Act "does not apply to the distributor relationship between it and Cloverdale, or if

such Act does apply, then such application is unconstitutional and in violation of Article I, § 10, of both the United States Constitution and the Michigan Constitution." In so doing, this court will enter a judgment dismissing Cloverdale's complaint on the merits and declaring that application of the MFUE Act to the case at hand violates the Contracts Clauses of the Constitutions of both the United States and the State of Michigan. This court will not grant Manitowoc any monetary relief, however, because any money damages alleged to have been suffered by Manitowoc in its countercomplaint were of its own making; Cloverdale did not cause any monetary damages to Manitowoc. Specifically, in its countercomplaint, Manitowoc alleges that after terminating Cloverdale as a distributor, it "delayed the implementation of the appointment of another entity as its sole distributor for sales and service of its cranes and excavators in Michigan, all to Manitowoc's damage." Yet, this court finds that it was Manitowoc's own choice to postpone the appointment of another dealer until this case was resolved and that Manitowoc was not bound to do so. Indeed, Cloverdale did not have any control over this decision by Manitowoc.

### *ORDER*

Therefore, it is hereby **ORDERED** that summary judgment be **GRANTED** in favor of Manitowoc on Count I and Count II of Cloverdale's complaint and that Cloverdale's complaint be dismissed on its merits.

It is **FURTHER ORDERED** that summary judgment on Manitowoc's counterclaim for declaratory relief and dismissal of Cloverdale's complaint be be **GRANTED** in favor of Manitowoc.

**IT IS FURTHER ORDERED** that Manitowoc's counterclaim for money damages and other relief is **DENIED** and dismissed on its merits. **SO ORDERED.**